## INTERSTATE COMMERCE COMMISSION v. CHICAGO FOOD MFRS. POOL CAR GROUP et al.

### No. 2132.

District Court, N. D. Illinois.
April 10, 1941.

Colin A. Smith and Hugh E. Lillie, both of Chicago, Ill., for plaintiff.

Mayer, Meyer, Austrian & Platt, of Chicago, Ill., for defendants.

SULLIVAN, District Judge.

The question before me is whether, under the present facts, Baxter or any member of the Big Ten is a "broker" as that term is defined in 49 U.S.C.A. § 303(a)(18) of Part II of the Interstate Commerce Act, dealing with motor transport, and which provides: "The term 'broker' means any person not included in the term 'motor carrier' and not a bona fide employee or agent of any such carrier, who or which, as principal or agent, sells or offers for sale any transportation subject to this part [chapter], or negotiates for, or holds himself or itself out by solicitation, advertisement, or otherwise as one who sells, provides, furnishes, contracts, or arranges for such transportation.", and therefore

obliged to secure a license under Sec. 311. Plaintiff contends that under this definition Baxter was a broker and further contends that Baxter's acts may be imputed to the members of the Big Ten, thus constituting them brokers. That the operations of Baxter, the members of the Big Ten, and the non-members should be considered in their entirety, and such operations being unlawful, an injunction should issue against all persons contributing to the unlawful plan, even though certain of the acts of the various defendants would in themselves be lawful, except as they constituted a part of the unlawful plan.

Baxter was employed by the Big Ten on a full time salary of $150 per month and actual expenses, each of the ten members contributing an equal portion of such salary and expenses. On behalf of the members of the Big Ten he provided, procured, contracted for and arranged transportation by motor vehicle for their various food products. His duties included the consolidation of less-than-truckload shipments into truckload shipments for the purpose of obtaining the benefit of lower rates, which were in force and published according to the requirements of the Interstate Commerce Commission. It was customary for him to include in the shipments of the Big Ten the shipments also of the five-non-members at the rate of .03 to .10 per hundred weight, paid to him as compensation for his services in arranging such transportation. All of these shippers were manufacturers and sellers of food products. Individual bills of lading or delivery tickets for each shipment were furnished the motor carrier by each shipper. After the consolidation of a shipment was accomplished bills of lading covering the entire truckload were made out by the motor carrier, showing the Big Ten as consignor and consignee, and also showing the names of each individual shipper and each individual consignee or each less-than-truckload shipment. Such shipments were receipted for by such motor carrier on the individual bills of lading or delivery receipts. When Baxter arranged for the transportation of individual shipments of members of the Big Ten at truckload rates, he received no additional compensation other than the $150 salary per month.

The stipulation contains no reference to Baxter and the Big Ten holding themselves out to the public, by advertisement or otherwise, as "one who sells, provides, furnishes, contracts, or arranges for" motor transportation.

What Baxter did he did on behalf of his employers. He did not solicit transportation for or on behalf of any motor carrier. He was in fact the traffic manager or agent for defendants, and under their directions he arranged for the transportation of their products. He also arranged for consolidation of their less-than-truckload shipments into truckload shipments, which any of the shippers themselves might have done on their own behalf in order to secure the benefits of a lower rate for transportation. I do not find anywhere in the Act any provisions which render such consolidations unlawful. If, as contended by plaintiff, there is a restriction against this practice, the law itself should contain the restriction, and this is a matter for the attention of the legislature, not for the court.

Sec. 211(a) of the Act provides for the licensing of "motor transportation brokers" and I believe it contemplates the licensing and regulating of independent persons or corporations who engage in the business of selling transportation, and is not designed to include persons regularly employed, such as traffic managers or agents, shipping clerks, or other salaried officers of shippers, whose business it is to arrange for transportation on behalf of their employers, and whose activities may be regulated and controlled by the Interstate Commerce Commission by reason of its jurisdiction over the activities of the shippers themselves. Both sides agree that Baxter was an agent for The Big Ten. The complaint alleges, at Page 2 thereof, "that the Big Ten had in its employ defendant Dave Baxter at a salary of $150 per month and expenses, with full power and authority to carry out on behalf of itself and each of its members the operations hereinafter set forth."

Defendants are not in the business of selling or providing transportation. They are admittedly all of them in the business of manufacturing and selling at wholesale non-competing items or classifications of food and food products, and that they utilize the services of motor carriers for the transportation of such food products and commodities to their various customers. Baxter, as agent and employee of the other defendants, does not "sell or offer for sale any transportation subject to this part." On the contrary, on be-

half of his employers he "buys" transportation for their use and benefit.

The case of Mesler Broker Application, decided November 16, 1939, and digested in 1 Fed.Carrier Cases, 435 (par. 7415), illustrates that the Commission itself does not interpret the term "broker" as covering a salaried agent such as Baxter. In that case the original report and order of the Examiner was adopted by the Commission, and is in part as follows:

"Applicant's proprietor is a customhouse broker, licensed by the Federal government on February 3, 1930, for the port of New York. An office, but no warehouse, is maintained. No motor vehicles are owned or operated. The traffic, chiefly glass jars and incidental articles, originates at Muncie, Ind., and other points in Indiana and adjacent states, and is consolidated at Muncie and shipped by railroad to New York for local distribution, for transfer to piers for export, or for reshipment to New Jersey points. Practically all of the latter service is by motor carrier. This procedure results in carload rates on the numerous less-than-carload shipments thus consolidated for transportation from Muncie to New York City. Applicant has no connection whatever with any motor carriers. Its compensation is derived wholly from the midwestern shippers, who ship carload quantities, with freight charges prepaid to it as local agent, and it then attends to the distribution of the individual less-than-carload shipments to retailers, wholesalers or exporters, as the case may be. The domestic shipment is done in applicant's name, but that from the piers to foreign countries is done in the name of the midwestern shipper. Usually the expense of the local or nearby motor carriage is borne by the consignee; if by the shipper, then applicant pays it and bills the shipper therefor.

" * * * The volume distributed by applicant ranges from 6 to 8 carloads per week.

"The facts of record fail to disclose any interest on applicant's part in the method of distributing transportation from cars to New York to ultimate destination other than that of obtaining safe and expeditious service in behalf of the seller and the purchaser. It does not represent any motor carrier or sell, offer for sale, or receive any compensation for the sale of motor carriage. When it engages such transportation it does so essentially as an agent of the shipper and in the same manner as any other shipper does. It is free to change from carrier to carrier as demands of the business or deficiencies of the carriage may require. Consequently, it is not a broker as defined in the act and is not entitled to a license under the provisions of section 211 thereof."

When Baxter engages transportation for his employers he does so as their agent, and in the same manner as any other shipper would do. He does not represent any motor carrier, or sell, offer for sale, or receive any compensation for the sale of motor carriage. As said before, Baxter buys transportation for and on behalf of his employers.

In the case of Faulk Broker Application, 10 M.C.C. 145, decided October 27, 1938, in holding that the applicant, who was a traffic manager on a salary and commission basis, the Commission said:

"Applicant testified that he had operated as a transportation broker since prior to June 1, 1935, but offered no proof of his operations except those conducted subsequent to October 15, 1935. He maintains a small office at Jasper, in the general offices of Morgan & Lindsey, a general merchandise firm which has approximately 50 branch stores in the states above named. He has been employed as traffic manager by Morgan & Lindsey since October 15, 1935, on a salary and commission basis. He devotes 90 per cent of his time to certain traffic and other matters of that firm and the remainder to his so-called broker operations. These operations, as conducted prior to the hearing, consist of arranging for the consolidation of less-than-carload shipments at strategic points, the movement thence in carloads by rail or water carriers to New Orleans and Shreveport, La., or other break bulk points, and the distribution therefrom in less-than-carload lots. Some of the shipments to concentration points and from distributing points were transported by motor carriers. For the most part the consolidated shipments consisted of merchandise owned by Morgan & Lindsey, but in some instances applicant arranged for the inclusion of goods owned by others in order to make up a carload. The shipments were consigned to Morgan & Lindsey in either event, and the arrangements were made in the name of that firm. For these services the applicant received from the

party bearing the freight charges a commission based on a percentage of the savings effected. He did not advertise or hold himself out to the public as a broker, and apparently he did not solicit any shipments which could not profitably be combined with those of his employer.

"Applicant advised us by letter shortly after the hearing that he had discontinued the arranging for any shipments except those of Morgan & Lindsey in his employee capacity, and that, in his opinion, he required no license to perform such services. We concur in that view. Under the circumstances the question whether the practice of arranging for the shipments of others, as above described, constitutes a broker operation need not be determined herein.

"We find that the service which applicant proposes to perform as employee of Morgan & Lindsey would not be that of a broker within the meaning of the Motor Carrier Act, 1935, and that the application should be denied."

In National Federation of Textiles, Inc., Broker Application, 10 M.C.C. 407, decided September 12, 1938, the Commission had under consideration the position of the Traffic Department of a trade association having numerous members. In that case the Commission said:

"The Federation has a multiplicity of functions. Of these functions only those of its traffic bureau are of interest in this proceeding. This bureau supplies the members of the Federation with an advisory service as to rates, routes, and shipping problems, and attempts to obtain equitable and stable rates and uniform classification in connection with the various transportation facilities used by the industry which the Federation represents. Its activities in arranging for motor transportation are confined to import traffic destined to the plants of the members of the association. This service is performed in the following manner: The owner of the goods to be transported forwards the import bills of lading, consular invoices, and other necessary papers to the bureau, which then arranges for customs clearance. At the same time the owner of the goods furnishes instructions as to the method of shipment to be used, that is, whether by rail or by motor and by what railroad or motor carrier. After customs clearance the shipments are forwarded in accordance with such instructions on bills of lading issued in the name of the owner of the goods shipped. The Federation does not solicit traffic for any motor carriers, although certain approved motor carriers are among its members. In the transportation of silk, because of its value and susceptibility to loss or theft, it is necessary to use thoroughly reliable carriers. For this reason, the Federation is sometimes called upon to recommend such motor carriers to its members, but the final choice of carriers rests with the user of the service at all times and not with the applicant. No negotiations with motor carriers are entered into by the Federation respecting the furnishing of transportation, except the actual shipping upon members' instructions and in the members' behalf. The Federation has entered into no contracts with motor carriers. * * *

"The examiner finds that the services provided by applicant in connection with motor transportation are not those of a broker; that no brokerage license is necessary for the continuance of such services; and that the application should be denied."

I am of the opinion that Baxter, in his dealings with the other defendants, was not acting as a broker within the definition contained in Sec. 203(a) of the Act. He was an agent employed by the various other defendants, and as such agent arranged for the transportation of their products, for which service they collectively paid him a fixed salary.

The prayer for permanent and perpetual injunction is denied.