**BINGLER VACATION TOURS, Inc.,**
**Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission,**
**Defendants.**

**Civ. A. No. 111–55.**

United States District Court
D. New Jersey.
July 14, 1955.

Edward G. Weiss, Paterson, N. J., for Bingler Vacation Tours, Inc.

Raymond Del Tufo, Jr., U. S. Atty., Newark, N. J., for the United States and Interstate Commerce Commission.

Edward W. Currie, Matawan, N. J., for intervenors.

James F. X. O'Brien, Newark, N. J., for Hudson Transit Lines, Inc., and Somerset Bus Co. Inc.

Benjamin L. Bendit, Newark, N. J., for Riverside Tours, Inc.

Before BIGGS, Circuit Judge, and MODARELLI and HARTSHORNE, District Judges.

BIGGS, Circuit Judge.

The plaintiff, Bingler Vacation Tours, Inc., is a New Jersey corporation and holds Certificate of Public Convenience and Necessity No. MC 599 issued by the Interstate Commerce Commission on March 3, 1948. The certificate authorizes Bingler to engage in transportation in interstate and foreign commerce as a common carrier by motor vehicle subject to the following specifications: "Irregular Routes: Passengers and their baggage, in special operation restricted to traffic originating at the points indicated in round-trip sightseeing or pleasure tours, from points and places in Passaic, Bergen and Essex Counties, N. J., and New York, N. Y., to points and places in Connecticut, Delaware, Maine, Maryland, Massachusetts, North Carolina, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Tennessee, Vermont, Virginia, and the District of Columbia, and return. Restriction: The service authorized above is subject to the following conditions: No passenger shall be picked up at any point not within the above-described base territory who has not purchased a round-trip tour ticket. Except in the case of a bona fide stop-over from one tour to a succeeding tour, no passenger shall be discharged at any point outside the described base territory other than the point of origin of that particular passenger." Section 207(a) of the Interstate Commerce Act, 49 U.S.C.A. § 307(a), authorizing the issuance of the necessary certificate to engage in interstate transportation whenever the present or future public convenience and necessity so requires, contemplates the type of certificate issued to Bingler by providing "That no such certificate shall be issued to any common carrier of passengers by motor vehicle for operations over other than a regular route or routes, and between fixed termini, except as such carriers may be authorized to engage in special or charter operations."

Among the operations conducted by Bingler under this certificate were bus services between New York City and three locations in New Jersey. Bingler offered one of these services between New York City and the horse racing track of the Monmouth Park Jockey Club, Oceanport, New Jersey, during the racing season of 1948 and 1949. A similar service was offered between New York City and the Garden State Race Track during the season of 1949. Bingler published tariffs which listed these operations as "Sightseeing Tours" and advertised the services as "Special Direct Buses." The tickets for the trips which were sold at the New York bus terminal whose facilities were used by Bingler were marked "1 day excursion," "good only on special excursion motor coaches," and "sightseeing and pleasure trip." The price of the tickets included only the transportation service. Bingler buses left the New York City terminal in time to reach the tracks before the first race. Direct routes were used; no guides were employed; and only short rest stops were made. The passengers were discharged at the entrance to the tracks and shortly after the last race the buses returned in the same manner to New York City.

Bingler also operated a bus service between New York City and Asbury Park, New Jersey, a beach resort, during the summer months of 1948 and 1949. The service was substantially similar to that operated to the race tracks except that in going to Asbury Park an indirect route along the sea coast was used. The trip was advertised as a "scenic tour of the North Jersey coast that provides the tourist with long-remembered vistas of seascape and landscape, along with a five hour stop at Asbury Park." On arrival at Asbury Park, passengers were discharged at a point along the beach, left to their own pursuits, and then returned directly to New York City in the evening.

In 1949, Asbury Park-New York Transit Corporation, a common carrier authorized to operate regular service between New York City and Asbury Park and the Monmouth track, filed a complaint with the Interstate Commerce Commission alleging that the Asbury Park and Monmouth operations of Bingler were unauthorized and were therefore in violation of Section 206(a) of the Interstate Commerce Act, 49 U.S.C.A. § 306(a), requiring authorization by certificate for interstate common carriage. I.C.C. No. MC–C–1047. In 1949, Quaker City Bus Company, certified to conduct regular service between New York City and the Garden State track, also filed a complaint charging that Bingler's Garden State service was unauthorized and violative of the Act. I.C.C. No. MC–C–1070. A number of common carriers of passengers and the National Bus Traffic Association intervened in support of the complaints. The cases were consolidated and heard by an examiner of the Commission who recommended that Bingler be ordered to cease and desist from the operations in issue. Division 5 of the Commission then considered the case and found that Bingler's race track services were unauthorized but that the Asbury Park operations were within the scope of its certificate. After petitions for reconsideration, the entire Commission heard argument and on October 4, 1954

issued its report and order. 62 M.C.C. 731.

In answer to the argument of the complainants that Bingler's earlier operations upon which its certificate was granted under the "grandfather" provisions of Section 206(a) of the Interstate Commerce Act, 49 U.S.C.A. § 306(a) (3), should be considered in construing the scope of the Bingler certificate, the Commission stated at sheets 15 and 16 of its report: "In view of the conclusion that the meaning of the term 'special operations in round-trip sightseeing or pleasure tours' is established and that there is no ambiguity in defendant's certificate it follows that we are not warranted in going behind defendant's certificate and considering the operations upon which it was granted."

In construing Bingler's grant of authority, the Commission said at sheet 17 of the report: "We conclude that the operations complained of, both those to and from the race tracks and those to and from Asbury Park, might fall within the term 'special operations,' but in view of the other more important restrictive language in defendant's certificate we do not believe this conclusion to be especially significant." After considering the restrictive language of "round-trip sightseeing or pleasure tours" contained in Bingler's certificate, the Commission concluded at sheet 24 that "round-trip sightseeing or pleasure tours, in special operations, which involve radial or territorial grants of authority, must include something substantial in addition to, or different from, bare expeditious transportation between two points which factor is the fundamental characteristic of ordinary regular-route passenger-carrier service."

The Commission then held Bingler's race track and Asbury Park operations to be no more than "bare expeditious transportation between two points." An order was entered "That defendant Bingler Vacation Tours, Inc., be, and it is hereby notified and required, on or before November 22, 1954, to cease and de-

sist, and unless and until appropriate authority therefor is obtained, thereafter to refrain and abstain, from the performance of any transportation, in interstate or foreign commerce, of the character found in said report on oral argument to be beyond the scope of the authority heretofore granted to it."

A subsequent petition of Bingler for reconsideration or, in the alternative, for further hearing incident to a general investigation was denied by the Commission. The effective date of the cease and desist order was subsequently postponed by the Commission until June 10, 1955. In the meantime, Bingler filed its complaint in this case under 28 U.S.C. § 2321 et seq. seeking an order setting aside the action of the Commission. A three-judge district court was constituted according to 28 U.S.C. § 2284. A number of petitions to intervene in support of the Commission's order were filed by those who had been parties before the Commission and were allowed in accordance with 28 U.S.C. § 2323. A hearing was conducted on May 27, 1955, and prior to the effective date of the Commission's cease and desist order, an order of this court dismissing the complaint was filed along with a per curiam opinion and findings of fact and conclusions of law.

Section 207 of the Interstate Commerce Act, 49 U.S.C.A. § 307, anticipates, as the Commission pointed out at sheets 13 and 14 of its report, that certificates might be granted for three distinct types of motor carrier service: for operations over "regular route or routes, and between fixed termini," for "charter" operations, and for "special" operations. Although these admittedly are broad categories, they are meaningful and the certificate issued to Bingler clearly falls within the category of "special" operations. The problem in this case is to determine just what types of special operations Bingler was authorized to carry on by its certificate. Since we agree with the Commission that Bingler's certificate is not ambiguous, that can be done properly only by construing the language of the certificate itself.

Bingler's certificate authorizes it to carry over "irregular Routes: Passengers and their baggage, in special operation restricted to traffic originating at the points indicated in round-trip sightseeing or pleasure tours, from [certain] points and places * * * to points and places in [a number of states] * * and return." We think that such words ordinarily require a carrier to conduct more than "bare expeditious transportation between two points"—to employ the Commission's own phrase. We must concede, however, that "bare expeditious transportation between two points" in some instances may be deemed to constitute a pleasure tour. For example, where a motor carrier transports passengers from a populated area to a shrine or recreation area, the service afforded might reasonably be thought of as a pleasure tour. The Commission has so regarded such service by granting pleasure tour certificates to carriers offering this type of transportation. See e. g., Smoky Mountain Tours Co., Common Carrier Application, 10 M.C.C. 127 (1938); Bowen Motor Coaches Common Carrier Application, 22 M.C.C. 691 (1940); and Taylor Common Carrier Application, 27 M.C.C. 550 (1941).

In the cases cited, however, each carrier was specifically authorized to operate its pleasure tour between fixed termini, so that bare expeditious transportation was contemplated as a characteristic of the service. But Bingler's certificate was not a grant of authority to operate between fixed points but an authorization to conduct over irregular routes "round-trip sightseeing or pleasure tours, From points and places in" three New Jersey Counties and New York City "to points and places in" a number of states. The Commission has described this as a radial or territorial grant of authority and we agree with the Commission that bare expeditious transportation was not contemplated and is not permissible under it.

As the Commission has pointed out, such a ruling does not mean that a carrier holding a radial or territorial tour certificate may not under certain circumstances operate primarily between two points. But when such service is undertaken, it must involve something more than bare expeditious transportation. The Commission explained this clearly at sheet 24 of its report, saying: "When, however, a carrier holding tour authority on a *radial or territorial basis* undertakes to set up a tour of one day or less between two specific points it then becomes important that something extra and something substantial be added to the bare transportation involved. If regularity, frequency, and expeditious service are introduced as additional factors in such point-to-point operation, then progressively it becomes even more important that these characteristics of an ordinary passenger operation not predominate in the service which is offered and provided to its patrons."

The nature of this distinction is illustrated by the decision of Division 5 of the Commission in Red Star Sightseeing Line, Inc., Common Carrier Application, 1 M.C.C. 521, 522 (1937), discussed at length in Bingler's brief. Red Star, which operated all-expense trips of several days duration through various states, also conducted one-day trips to Asbury Park and to Lake Hopatcong, New Jersey. On the basis of all of these operations Red Star was granted a territorial tour certificate. But the opinion in the Red Star case reveals that "something extra and something substantial" was added to bare transportation to Asbury Park and Lake Hopatcong. The Commission states: "Tickets are sold individually in advance for reserved seats for specific round-trip tours, with no pick-up or discharge of passengers en route. Stops are made at various points of interest, with the driver acting as a guide in instances where no guides are on duty." Thus, where something more than bare expeditious transportation characterizes the service, point-to-point operations may be conducted under a territorial tour certificate. See, e. g., Blue & Grey Sight Seeing Tours, Inc., Common Carrier Application, 8 M.C.C. 124 (1938), and Resler v. Hunter Clarkson, Inc., 41 M.C.C. 665 (1943).

Since Bingler must rely upon the language of its certificate in making its plans and investments, it is important that the language be clear and definite. As we have said, we think that the Bingler certificate is clear and that the Commission's interpretation of the certificate is the proper and reasonable one. The action of the Commission in prior cases indicates the pattern followed by the Commission in this case in distinguishing between point-to-point tour certificates and territorial tour certificates and between allowable and prohibited point-to-point service under a territorial certificate. Moreover, by classifying special operational certificates along these lines, the Commission is acting within its powers in furtherance of a legitimate purpose. In certain situations, certification for expeditious point-to-point tour service may be warranted either because there is no ordinary regular-route service or because there is a need to supplement the regular service. In other situations, where there is adequate expeditious point-to-point service, it may be necessary to allow only territorial tour operations. "Otherwise," as the Commission has said at sheet 25 of its report in the instant case, "a carrier holding such authority, without any fixed responsibility to the public, could concentrate at will on practically any points of its choosing within its authorized territory in direct and destructive competition with the ordinary regular-route carrier upon which the public must depend for its day-to-day basic transportation, in violation of the purport of its certificate and contrary to the public interest and the national transportation policy."

It is our conclusion that Bingler's territorial tour certificate did not authorize it to conduct the bare expeditious service which it operated between New York City, on the one hand, and

Monmouth, Garden State, and Asbury Park, on the other. Although the most direct route was not used by Bingler on the out-bound trip to Asbury Park, we do not think this was sufficiently significant to change the expeditious nature of that service. The order of the Commission prohibiting these operations must therefore be sustained.

■ Bingler argues that by prohibiting it from performing "any transportation, in interstate or foreign commerce, of the character found in said report on oral argument to be beyond the scope of the authority heretofore granted to it," the Commission has gone beyond the scope of this case and placed Bingler in the dilemma of assessing the legality of its other carrier operations at the risk of contempt proceedings. But the hardship on Bingler seems slight for the Commission explained the criteria of proper territorial tour service clearly and adequately in its report. Moreover, the repetition of similar prohibited conduct in like situations may be anticipated and enjoined along with the particular operations in issue in this case. See Brady Transfer & Storage Co. v. United States, D.C.S.D.Iowa 1948, 80 F.Supp. 110, 118, affirmed 1948, 335 U.S. 875, 69 S.Ct. 239, 93 L.Ed. 418. Cf. Consolidated Flower Shipments, Inc.,—Bay Area v. Civil Aeronautics Board, 9 Cir., 1954, 213 F. 2d 814, 818, and Schauffler v. United Association of Journeymen & Apprentices of Plumbing & Pipe Fitting Industry, 3 Cir., 1955, 218 F.2d 476, 480.

■ Bingler also complains of the denial of its petition to the Commission to reopen the case or to institute a general investigation but these were matters which rested within the discretion of the Commission. See Interstate Commerce Commission v. Jersey City, 1944, 322 U. S. 503, 514–519, 64 S.Ct. 1129, 88 L.Ed. 1420, and United States v. Pierce Auto Freight Lines, 1946, 327 U.S. 515, 535, 66 S.Ct. 687, 90 L.Ed. 821. We cannot say that the Commission abused its discretion in denying the relief sought.

Findings of fact were filed by this court on June 9, 1955, as were conclusions of law. What we have said in this opinion supplements those findings and conclusions. Bingler's complaint was dismissed by an appropriate order on June 9, 1955.