NATIONAL BUS TRAFFIC ASSOCIA-
TION, Inc., and Hudson Transit
Lines, Inc., Plaintiffs,

v.

UNITED STATES of America and In-
terstate Commerce Commission,
Defendants.

Civ. A. No. 736-55.

United States District Court
D. New Jersey.

July 30, 1956.

James F. X. O'Brien, Newark, N. J., for Hudson Transit Line.

Jack R. Turney, Jr., Washington, D. C., for Nat. Bus Traffic Assn. Inc.

Francis V. Goggins, New York City, Bronson Goddard, Montclair, N. J., S. Harrison Kahn, Washington, D. C. for Tauck Tours, Inc.

S. Harrison Kahn, Washington, D. C., Arthur Teich, Trenton, N. J., for Thomas Cooke & Son and Parker Tours.

Robert W. Ginnane, Gen. Counsel, James Y. Piper, Isaac K. Hay, Asst. Gen. Counsel, I. C. C., Washington, D. C., for I. C. C.

Stanley N. Barnes, Asst. Atty. Gen., E. Riggs McConnell, Washington, D. C., James E. Kilday, Sp. Assts. to Atty. Gen., Raymond Del Tufo, Jr., U. S. Atty., Newark, N. J., for the United States.

William H. Campbell, Jr., Newark, N. J., and Jerrold Scoutt, Jr., Washington, D. C., for American Society of Travel Agencies, Inc., Intervenor.

Before BIGGS, Circuit Judge, and MODARELLI and HARTSHORNE, District Judges.

BIGGS, Circuit Judge.

This is an action to set aside an order [1] of the Interstate Commerce Com-

---

1. The identical proceedings, save those set out in 63 M.C.C. ——, were before this court in Civil Action No. 168-53. The  court, being then constituted as it is now, vacated the order of the Commission of November 3, 1952, denying reconsidera-

mission in Docket No. M.C.–29488 (Sub. No. 3), Tauck Tours, Inc., Extension, New York, N. Y., granting Tauck an extension of its existing authority as a broker to conduct operations as described at a later point in this opinion. The plaintiffs are National Bus Traffic Association, Inc. and Hudson Transit Lines, Inc., who oppose the authority granted to Tauck on several grounds. National Bus Traffic Association, Inc. represents 383 common carriers of passengers by motor vehicle, carriers who have the certificated authority to carry passengers who are individual ticket holders and, as an incident of such certification, also to serve as charter operators. Hudson Transit Lines, Inc. is a New Jersey corporation holding, to use the words of the complaint, "a certificate from the Interstate Commerce Commission authorizing operations with which operations authorized by the [Commission's] * * * order [in effect as to Tauck] would be directly competitive". It is a member of the National Bus Traffic Association, Inc. and like it participated in all of the proceedings before the Commission.

Tauck has operated all-expense travel tours usually by motor bus, to various points in the United States and Canada from the New York City area since 1926. Before the present proceeding began Tauck had been licensed to engage as a broker of transportation by motor vehicle of passengers and their baggage pursuant to the "grandfather" clause of the Motor Carrier Act, 1935, now Section 209, Part II of the Interstate Commerce Act, 49 U.S.C.A. § 309, between New York City and Newark, New Jersey, as originating points on the one hand and destination points in a number of northeastern states and the District of Columbia on the other hand.[2] In the present proceeding the Commission extended Tauck's geographical authority as a broker to operate all-expense tours originating at New York, Newark and Philadelphia, to all points in the United States.[3]

Tauck's tours are all-expense arrangements, so-called "package tours". Tauck sells individual "certificates of membership" in a specific tour to individual travelers, who ordinarily make arrangements either through Tauck's own offices or through travel bureaus or similar factors, which serve as selling agents for Tauck. The single price which the individual tourist pays for his certificate of membership covers almost all of the expenses of the trip, specifically including transportation, meals, and hotel accommodations. Tauck ordinarily uses motor buses as the means of transportation on its tours but railroad and water transportation are also employed occasionally. Only motor bus transportation is involved in the instant case. What the terms "charter" or "charter authority" mean is discussed at length hereinafter. It is sufficient to state at this point that Tauck's practice is to charter a motor bus from an operator holding a certificate of convenience and necessity from the Interstate Commerce Commission under Section 207 of the Interstate Commerce Act. See 49 U.S. C.A. § 307. Since Tauck plans its trips far in advance, it must also, at least on occasion, charter a motor vehicle before it or its agents have concluded the sale of certificates of membership to the general public for that particular trip.

In the hearing before the Commission, Tauck estimated that 90% of the bus

tion, to the end that the Commission might make a clear and definitive order implementing its report of April 21, 1952, 54 M.C.C. 288. See 122 F.Supp. 876. The Commission thereupon reviewed the record, and made a further report and order on April 18, 1955, as appears from the report, just cited. This is the order reviewed in the case at bar.

2. Tauck has also been authorized to act as a broker between Washington, D. C. and a number of northeastern states and the District of Columbia and between New York and Newark to points in Alabama, Mississippi and Louisiana.

3. With the exceptions that no arrangements may be made for the transportation of any passenger from or to any point within 25 miles of New York City other than New York and Newark.

transportation arranged by it was obtained from charter operators at a flat rate for the hire of the whole bus. Tauck does not own any motor vehicles and does not lease any. It does not operate the buses or other transportation facilities itself. The chauffeur or driver, employed by the bus company, controls the vehicle. In other words, the carrier has sole control of the bus or buses. Tauck does supply a tour director who looks after the comfort of the participants in the trip and is in general charge of accommodations and other similar arrangements. Tauck is one of the largest of a number of all-expense tour operators who have developed a substantial industry out of this branch of the vacation and tourist business in the United States.

In order to understand the difficulties in which Tauck presently finds itself it is necessary to review some of the provisions of the Motor Carrier Act of 1935, Section 201 et seq., Part II of the Interstate Commerce Act. See 49 Stat. 543, 49 U.S.C.A. § 301 et seq. Part II sets out a comprehensive scheme of regulation of motor carriers under the supervision of the Interstate Commerce Commission which is given broad power to grant certificates and licenses to motor carriers and to prohibit unregulated motor transportation of passengers and freight. The statutory scheme provides for licensing or certificating kinds of motor vehicle operators engaged in interstate commerce including common carriers, contract carriers, as well as motor transportation brokers. The various classifications are defined in Section 203, Part II, of the Act. 49 U.S.C.A. § 303.

The Commission has classified all-expense tour operators, including Tauck itself, as "brokers" under the Act.[4]

Tauck made its application to the Commission, the subject of the present proceedings, in 1948. In the administrative process before the Commission Tauck's application was considered a number of times with different results. The Examiner who heard the case was of the view, and so recommended, that Tauck's application should be denied on the ground that Tauck was not a broker but a common carrier. Division 5 of the Commission concluded that Tauck was acting as a broker and granted it the geographic extension it sought but expressly conditioned the grant by prohibiting Tauck from chartering buses or other motor transportation. This opinion required Tauck to use only motor carriers who had been authorized by the Commission to sell individual tickets to passengers. See 1949, 49 M.C.C. 491.

Division 5 then granted Tauck's petition to reconsider and in a second opinion and order granted Tauck's extension application and permitted Tauck to use charter bus service provided the certificates of membership issued to the individual tourists "should clearly specify that purchase of a share or membership in the group by the individual shall amount to a designation of * * * [Tauck] as agent for the group members singly and collectively for the purpose of arranging such motor transportation." Division 5 also required that the contract for charter service "should be made in the name of the group by * * * [Tauck] as agent in order that there may be no question as to the carrier's direct responsibility as a carrier to the group members." See 1951, 52 M.C.C. 373.

The matter then came before and was decided by the Commission[5] on April 21, 1952. In substance the Commission affirmed the order of Division 5 on reconsideration, allowing Tauck to use charter service, but made three conditions: "(1) provided the contract negotiated with the carrier furnishing the motor transpor-

---

4. See Cain Broker Application, 2 M.C.C. 633 (1937); Tauck Tours, Inc. Contract Carrier Application, 10 M.C.C. 361. In the second case cited, Tauck originally applied for a certificate of convenience and necessity as a contract carrier but the Commission classified it as a broker on the authority of the Cain case.

5. The Chairman and one Member were absent. Two Members dissented.

tation is one between it and the group members collectively,[6] (2) provided the carrier is paid its full published charter fare, and (3) provided that * * * [Tauck] in arranging the motor transportation does not receive a commission from the carrier." See 54 M.C.C. 291. The decision in the Tauck case has been followed by the Commission in disposing of a number of subsequent applications by all-expense tour operators.

6. It will be observed that though Division 5 required that a purchase of a share or membership in the group by the individual should " * * * amount to a designation of Tauck as agent for the group members, singly and collectively * * * " the Commission as a whole required only that the contract negotiated with the carrier be "one between it and the group members collectively * * * "

7. The word "charter" appears twice in Part II of the Interstate Commerce Act. In both places it is coupled with the word "special". Section 207(a) provides for certificates of convenience and necessity to be issued to any qualified applicant therefor provided the Commission makes certain necessary findings, and also " * * * Provided, however, That no such certificate shall be issued to any common carrier of passengers by motor vehicle for operations over other than a regular route or routes, and between fixed termini, except as such carriers may be authorized to engage in special or charter operations." Section 208(c) is discussed later in the text of this opinion, and authorizes any certificated common carrier to transport "special or chartered parties" to any place in the United States under such regulations as the Commission may provide. 49 U.S.C.A. § 308(c). The words "special" and "charter" are not defined in the Act itself.

In its regulations, the Commission has defined "special or chartered parties" as it occurs in 208(c) as follows: "The term 'special or chartered party,' as used in these regulations, means a group of persons who, pursuant to a common purpose and under a single contract, and at a fixed charge for the vehicle in accordance with the carrier's tariff, lawfully on file with the Commission, have acquired the exclusive use of a passenger-carrying motor vehicle to travel together as a group to a specified destination or for a particular itinerary, either agreed upon in advance or modified by the chartered group

Most interstate bus operators certificated by the Commission are authorized to sell individual tickets to passengers, but some are not. The operators prohibited from selling individual tickets are restricted to hiring out their buses at a flat rate to groups interested in contracting for a bus or buses for a specific trip. The limited authority granted these operators is commonly referred to as "charter" authority.[7]

after having left the place of origin." Ex parte No. MC–29, 29 M.C.C. 25, 47–48; 49 C.F.R. Part 178.

"Special" or "charter operations" referred to in Section 207(a) are defined differently however. In Fordham Bus Corp. Common Carrier Application, 29 M.C.C. 293, 297, the Commission said, "The terms 'charter' and 'special' operations as applied to motor carriers of passengers under Part II of the Act are frequently confused and sometimes erroneously used as virtually synonymous. It is clear, however, that, properly employed, each identifies a particular and distinct type of service. Charter service contemplates the transportation of groups, such as lodges, bands, athletic teams, schools, or other travel groups, assembled by someone other than the carrier, who collectively contract for the exclusive use of certain equipment for the duration of a particular trip or tour. Special service, on the other hand, contemplates that service generally on week-ends, holidays, or other special occasions to a number of passengers which the carrier itself has assembled into a travel group through its own sale to each individual passenger of a ticket covering a particular trip or tour planned or arranged by the carrier." The Commission's distinction in the Fordham Bus case was accepted by the three-judge District Court when the case was reviewed. See Fordham Bus Corporation v. United States, D.C., 41 F.Supp. 712, 717.

It is not necessary to discuss the difference between "charter" and "special" in order to decide the case at bar, however. The vital distinction in this case is between carriers authorized to sell individual tickets to passengers (regular route operators and special operators as defined in Fordham Bus) and carriers who may hire out a bus only to a group at a flat rate for the proposed trip (charter operators under either the regulations or Fordham Bus).

To be contrasted with the "charter" operators are common carriers who operate established interstate bus routes under certificates issued by the Commission and who are entitled to sell individual tickets to the passengers which they carry. As an incident of their regular route authority, Section 208(c), 49 U.S.C.A. § 308(c), of the Act grants common carriers operating routes with fixed termini the right to carry "special or chartered parties" from any point in the area regularly served by them to any point in the United States and return. See Peninsula Transit Corp. Common Carrier Application, 1937, 1 M.C.C. 440. Under the rule-making authority granted to it by this section of the Act, the Commission has established regulations governing the transportation of "special or chartered parties". See, 1949, 29 M.C.C. 25, 47–48, 49 C.F.R. Part 178. But it is noted that these regulations apply only to these special parties carried incidentally by regular route operators, and not to transportation by charter operators who do not have any regular route authority at all, or to motor transportation brokers. The regulations expressly prohibit regular route carriers from selling individual tickets to passengers carried to any point beyond the authorized routes. See 29 M.C.C. 25, 49.

The dispute here is not as to whether Tauck should have been granted the specified geographical extension it seeks—this is conceded—but whether in making use of the extension Tauck shall be allowed to use, as it has used in the past, chartered motor vehicles to transport its passengers, as appears from the reports of the Commission.

Section 203(a) (18), 49 U.S.C.A. § 303 (a) (18), provides that "The term 'broker' means any person not included in the term 'motor carrier' and not a bona fide employee or agent of any such carrier, who or which, as principal or agent, sells or offers for sale any transportation * * *, or negotiates for, or holds himself or itself out by solicitation, advertisement, or otherwise as one who sells, provides, furnishes, contracts, or arranges for such transportation."

Section 211(a) of the Act, 49 U.S.C.A. § 311(a), states that "No person shall for compensation sell or offer for sale transportation subject to this part or shall make any contract, agreement, or arrangement to provide, procure, furnish, or arrange for such transportation or shall hold himself or itself out by advertisement, solicitation, or otherwise as one who sells, provides, procures, contracts or arranges for such transportation, unless such person holds a broker's license issued by the Commission to engage in such transactions: *Provided, however,* That no such person shall engage in transportation subject to this part unless he holds a certificate or permit as provided in this part. In the execution of any contract, agreement, or arrangement to sell, provide, procure, furnish, or arrange for such transportation, it shall be unlawful for such person [a broker] to employ any carrier by motor vehicle who or which is not the lawful holder of an *effective certificate or permit* issued as provided in this part: *And provided further,* That the provisions of this paragraph shall not apply to any carrier holding a certificate or permit under the provisions of this part or to any bona fide employee or agent of such motor carrier, so far as concerns transportation to be furnished wholly by such carrier or jointly with other motor carriers holding like certificates or permits, or with a common carrier by railroad, express, or water."

What effect shall be given to Section 211 in the light of Section 203(a) (18) and of the whole Act, and, in particular, what meaning shall be ascribed to the phrase "effective certificate or permit" which we have italicized in the preceding paragraph?

The second *proviso* clause of Section 211(a), quoted above, excepts any bona fide agent of a motor carrier from the operation of the provisions of the section. The plaintiffs contend, however, that to be a "broker", as defined in Section 203(a) (18), one must act as an

agent not only for the passenger but also for the carrier for the purchase and sale of transportation: otherwise one is no broker; that Tauck was constituted by condition "(1)," 54 M.C.C. at page 306, imposed by the Commission's order (i. e., " * * * the contract negotiated [by Tauck] with the carrier furnishing the motor transportation * * * [must be] one between it [the carrier] and the group members collectively * * * ") as the exclusive agent for its patrons in contracting for transportation and that therefore it cannot be a "broker" within the definition of the Act. It follows, say the plaintiffs, since Tauck has been held not to be a "carrier", there is no way in which it can lawfully sell its certificates of membership.

Further, say the plaintiffs, even if Tauck can be deemed to be a "broker" under the first *proviso* clause of Section 211(a), it cannot employ any carrier by motor vehicle who does not have "an effective certificate or permit", and this means that if Tauck sells individual certificates of membership—mere "tickets"—then Tauck in procuring transportation for its patrons can employ only carriers who are licensed to sell individual tickets. Otherwise, it is argued, any charter operator could break down the limitations so carefully placed on his operations by the Commission pursuant to the authority conferred by the Act for if

such a carrier wished to reap the benefits from sales, expressly prohibited to him of individual tickets, he could do so by the easy subterfuge of engaging an obliging licensed broker to do the selling for him as his agent.

As to the first argument, that respecting the use of the terms "agent" and "broker" as employed in Sections 203(a) (18) and 211(a), we do not encounter great difficulty. It can be argued that the term "agent" in the definition section, Section 203(a) (18), must have been employed by Congress in two different senses, a substantial legal anomaly and one discussed by the Commission at some length.[8] But we think it unnecessary to resolve this question of interpretation for one who procures transportation for an individual or for a group may remain a broker whether or not he is also an agent for an individual or for a group, and for the carrier. We conclude that a travel agency such as Tauck may procure or engage transportation for an individual or for a group and still remain a "broker" within the meaning of the Act. Cf. Copes Broker Application, 1940, 27 M.C.C. 153.[9]

Directing our attention now to the plaintiffs' argument based in particular on Section 211(a), the "effective certificate or permit" provision, it should be noted that the effect of the Commission's condition "(1)," 54 M.C.C. at page 306,

8. The Commission attempts to avoid the apparent difficulty by interpreting the word "agent" in two different senses. See Cain Broker Application, 1937, 2 M.C.C. 633. Cf. I. C. C. v. Chicago Food Mfrs., D.C.N.D.Ill.1941, 39 F.Supp. 283. If we apprehend correctly the position of the Commission in the Cain case it construes the term "agent", first occurrence, as denoting a very close relationship to the carrier, practically that of an employee, but on its second occurrence, gives the word its usual meaning in the law of agency. Legislative history throws no light on the problem of construction.

The principal reason why the Act required motor transportation brokers to be licensed was because unscrupulous brokers were disrupting the industry by retaining financially irresponsible carriers.

See Senate Document 152, 73rd Cong. 2d Sess. at p. 226 (Report of the Federal Coordinator of Transportation). Since irresponsible carriers are not certificated, Section 211(a) has prohibited disruptive transactions between brokers and carriers.

9. But see and compare such decisions as Interstate Commerce Commission v. Chicago Food Manufacturers Pool Car Group, D.C., 39 F.Supp. 283; Nevins Distributors, Inc., Broker Application, 51 M.C.C. 383; Faulk Broker Application, 10 M.C.C. 145; Mesler Broker Application, Docket No. M.C. 23867, decided November 16, 1939, cited with approval in 39 F.Supp. 283, 291; National Federation of Textiles, Inc., Broker Application, 10 M.C.C. 407; Copex Company, Inc., Broker Application, 14 M.C.C. 689.

has been to cause Tauck to make use of a legend on its membership certificates by which the holder of the certificate, as a member of the collective tour group, has designated Tauck as agent for the purpose of arranging group motor transportation; that this, in the view of the Commission, had authorized Tauck to charter buses from carriers not certificated to sell individual transportation to passengers, thus rendering the cerificates of such carriers "effective" within the meaning of Section 211(a).[10] The plaintiffs brand the legend as a "sham recitation"[11] designed to elude the "effective certificate or permit" language of Section 211(a). It must be conceded by the plaintiffs, however, that a preformed group of travelers—for example the members of a golf team or of an orchestra—may lawfully charter a bus for a tour. The Commission thought that

Tauck's patrons, traveling and sightseeing together have a "community of interest" about the equivalent of that of a performed group; that, therefore, if a collective contract for transportation be effected for its group by Tauck such a contract may be deemed to be a true "charter".[12]

But the substantial question before us is: is the Commission's position a tenable one? Does it have support in the record and in the law? Is it sufficiently rational to withstand the attack on the ground that the Commission has made a mere play on words, and has altered the law and its prior rulings by a syllogism? It is clear that the Commission has approached its problems with dexterity, and not with delight. Perhaps the legal management of our very complex modern transportation systems is the art of the possible. In any event our powers of re-

10. The Commission itself in the instant proceeding stated that in order for the "effective certificate or permit" phrase " * * * to have any real meaning [it] must require that the carrier performing the transportation service be not only the holder of a certificate or permit, but the holder of a certificate or permit authorizing it to perform the particular type of motor transportation for which such arrangements have been made by the broker."

The Commission went on to say: "Otherwise the prohibition, though offering protection to the motor carrier against the invasion by one not authorized to perform any interstate motor transportation, would not afford any guarantee against invasion of operating rights by any holder of a certificate or permit, however remotely related that authority might be to the transportation for which arrangements have been made by the broker." See 54 MCC 304.

11. See, for example, the petition of Hudson Transit Lines, Inc., as intervener in the proceedings before the Commission, dated January 6, 1955.

12. The question of whether the new form of contract changed any substantive contract rights was thoroughly covered in oral argument before this court. Before the ICC decision, Tauck's certificate of membership stated that Tauck undertakes "to act as agent only." Whether this meant as agent of the individual tourist or as agent of the carrier is not clear.

The requirement added by the Commission is that " * * * the contract negotiated with the carrier is one between it and the group members collectively." On a conceptual level, it is now possible to argue that each traveler has now become individually responsible for the full charter rate which Tauck has agreed to pay the carrier for the hire of the bus, if Tauck itself does not pay. But if the new contract is approached from the more practical view of the intent of the parties and the Commission, it is highly doubtful that any such secondary liability was intended to be put upon the individual tourist.

This discussion is highly speculative and likely to remain so. Legal research has disclosed no reported case in which there was any attempt to hold individual travelers liable for the full charter price. There is at least one case involving a bus charter's liability for negligence, but it decided that the driver of the bus was an employee of the owner-charterer of the bus rather than of the chartering group. Goldwyn v. Coast City Coaches, Inc., 1943, 129 N.J.L. 501, 30 A.2d 295. In the contract between the chartering group and the bus owner in that case, the bus owner retained control of the mechanical operation of the bus subject only to routing direction by the group. This is one of Tauck's arrangements also. Moreover, Tauck is bonded as the Commission pointed out in its final report, 63 M.C.C. ——.

view are limited.[13] We may not set aside the Commission's order simply because we might have reached a different conclusion on the same record. We must give due credit to the expertness of the Commission in the field Congress has confided to it.

In the light of the entire record we conclude the order of the Commission should not be set aside. The arguments of the plaintiffs, while appealing, necessarily possess an abstract quality under the instant circumstances for Tauck is not participating in a fictitious or sham device to grant "charter" operators, as defined by the Act, broader transportation authority than their present certificates allow them. Tauck has its own valid business reasons, which have nothing to do with extending the authority of charter operators, for having sought the extended certification granted it by the Commission. Tauck is an independent entrepreneur, supplying a useful service which it has developed for itself. Tauck could complain with justice if its traditional way of doing business is now disrupted because other transportation entrepreneurs who also are licensed as "brokers" are able to make use of arrangements similar to Tauck's for illegitimate ends of their own. Should charter carriers or licensed brokers embark upon such nefarious courses of conduct the powers of

the Commission are ample to investigate their actions, cancel their licenses or certifications, and, if necessary, make rules and regulations to correct possible abuses.

It must be borne in mind also that there is no express provision in the Motor Carrier Act, and nothing in its legislative history, to indicate that all-expense tour operators such as Tauck were to be prohibited from carrying on their established practices of chartering buses. And we also note that no question about tour operators' use of chartered buses was raised for thirteen years after the Motor Carrier Act became effective—indeed, we believe, not until the inception of the instant proceeding.[14] These are cogent considerations.

As to the form of words, the legend required by the Commission's order, we find it none too magical but we perceive no harm in requiring such a legend to be employed. It is not the words which are important but the circumstances which surround Tauck's tours. Though the individual membership certificates do entitle each individual Tauck patron to transportation and in this sense are "tickets," a good deal more than bare individual transportation is involved. The tour is attractive because it is a group adventure. Few people travel to look alone upon Niagara Falls or the Grand Can-

13. In Acme Fast Freight v. United States, D.C.Del.1953, 116 F.Supp. 97, 99–100, it was said: "The scope of review by this court of orders of the Commission is limited. United States v. Pierce Auto Freight Lines, Inc., 1946, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821; I. C. C. v. Union Pacific Railroad, 1912, 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308. Judicial review of Commission orders is now governed by the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq. See Riss & Co. v. United States, D.C.W.D.Mo., 96 F.Supp. 452, reversed 1951, 341 U.S. 907, 71 S.Ct. 620, 95 L.Ed. 1345."

14. The Commission stated: "Applicant and other all-expense tour conductors have been operating in the manner described for many years. In numerous decisions licenses have been granted, allowing the continuance or expansion of

existing operations, or the institution of new operations of the same type. The method of operation was not challenged by any party or questioned by us prior to this proceeding, and over the years it has not produced the dire results now envisaged by interveners. On the contrary, we think all-expense tour conductors operating in the manner described have not only supplied a service needed by the traveling public but have developed substantial traffic beneficial to regular-route carriers. Now to close the door to the use by all-expense tour conductors of charter service whether supplied by regular-route carriers under authority of section 208(c) of the act or by carriers operating under certificates specifically authorizing charter service would be a disservice to the public and probably also to the regular-route carriers." See 54 M.C.C. 291, 305.

yon of the Colorado. Whether the group be formed by Tauck before or after the charter of the motor bus seems unimportant; nor does it seem a weighty circumstance that Tauck itself forms the group and not some outside individual, such, for example, as a ski instructor at a ski resort. The important thing is that the Tauck group is a cohesive whole interested in a tour for pleasure, and not in mere transportation.

Our conclusion is that Tauck is entitled to the extension which the Commission has granted it and may charter buses to carry its patrons as the Commission has ruled. We find that the Commission's determination is in the interest of the national transportation policy and we will not set aside the order complained of.

Other points raised by the plaintiffs do not require discussion for we find them to be without merit.

All petitions for intervention will be allowed.

The complaint will be dismissed for want of equity.

Findings of fact and conclusions of law are filed concurrently with this opinion. Rule 52(a), F.R.C.P. Title 28 U.S.C.

HARTSHORNE, District Judge (concurring).

The real truth of the matter is that while the sightseeing tour industry conducted in the manner used by Tauck was well known for many years before and after the enactment of the statute,[1] neither the statute nor its legislative history refers to that industry. The language of the statute, adopted with other situations in mind, should not lightly be construed to wipe out this long existing, wholesome industry. The purpose of the statute was of course to protect both the public and the bus transportation industry throughout the country, but to prevent the various branches of the industry from inequitably interfering with each other. This group sightseeing in-

dustry so differs in nature from mere individual transportation, that the one does not inequitably interfere with the other. But when an all-expense paid sightseeing tour becomes in reality mere ordinary transportation, so as to affect inequitably regularly scheduled operations, the Commission and this Court in the past has not hesitated to effectuate the intent of the Act and prevent its violation. Bingler Vacation Tours, Inc. v. U. S. A., D.C.N.J.1955, 132 F.Supp. 793.

Thus there is reason, in accordance with the intent of the statute, for the I. C. C. to set up conditions, carried out on the face of the contracts involved here, whereby the language of the statute can not be construed to wipe out this well established, wholesome industry. Since this action of the Commission therefore can not be found to be without reason, this Court must affirm the holding of the Commission, in accordance with well established principles.

---

1. Tauck Tours began operations in 1926; the Motor Carrier Act, 49 U.S.C.A. § 301 et seq. was adopted in 1935; Tauck's op-

erations were first attacked before the Commission in 1948.