The ARROW LINE, INC.

v.

UNITED STATES of America and Interstate Commerce Commission, Greyhound Lines, Inc., Intervenor-Defendant,

and

Providence Arrow Line, Inc., Intervenor-Defendant.

Civ. No. 11120.

United States District Court
D. Connecticut.
June 21, 1966.

Hugh M. Joseloff, Joseloff, Murrett & Knierim, Hartford, Conn., for plaintiff.

John H. D. Wigger, Antitrust Div., Dept. of Justice, Washington, D. C., Jon O. Newman, U. S. Atty., David Margolis, Asst. U. S. Atty., Hartford, Conn., for the United States.

Clarence W. Vandegrift (for ICC) Gen. Counsel's Office, I. C. C., Washington, D. C., for Interstate Commerce Commission.

Henry Robinson, Jr., Hartford, Conn., J. G. Dail, Jr., Washington, D. C., for Greyhound Lines, Inc. and Providence Arrow Lines, Inc.

John R. Sims, Jr., Washington, D. C., for Providence Arrow Line, Inc.

Before SMITH and ANDERSON, Circuit Judges, and BLUMENFELD, District Judge.

BLUMENFELD, District Judge.

The Arrow Line, Inc., of East Hartford, Connecticut, brought this action under 28 U.S.C. § 2325 to set aside or annul an order of the Interstate Commerce Commission which denied its application for a certificate of public convenience and necessity. See 49 U.S.C. §§ 305(g) and 17(9). Plaintiff applied for authority to operate a limousine service in interstate commerce, 49 U.S.C. § 307(a), and, after a hearing at which intervening defendants Greyhound Lines, Inc. and Providence Arrow Lines, Inc. were protestants, the hearing examiner recommended that a certificate authorizing the proposed service be granted. On exceptions filed by protestants, the Commission, by its Operating Rights Review Board No. 1, one member absent, while finding the hearing examiner's statement of facts "to be accurate in all material respects" and adopting it as their own, concluded that the application should be denied. The Commission, by its Division 1, confirmed Board No. 1 on applicant's petition for reconsideration.

Plaintiff presently operates buses from and in Connecticut under regular and irregular ICC route authority. Its regular authority is chiefly between Hartford and Albany, New York, by way of Pittsfield, Massachusetts, and between Albany and New Haven, Connecticut. Its irregular authority extends to operations from Connecticut to New York race tracks. It has no regular authority between Hartford and New York City. Protestants do.

Plaintiff proposed to initiate a limousine service between Hartford and New York City. Essentially the service was to be 7-passenger, non-stop, semi-scheduled, over irregular routes, by reservation,

door-to-door, year round, and from anywhere within Hartford County, area 740 square miles, to anywhere within the five Boroughs of New York City, or the reverse. Fares from the more remote areas of Hartford County to New York were not calculated, but applicant did state that the price would be $16 one way from Windsor Locks, north of Hartford; $15 from Manchester, to the east; $14 from the Hartford area and New Britain; and $13 from Bristol to the southwest. No discount for round trip travel was contemplated. Hartford-New York bus fares were $3.95 one way. Whoever requested the service would be accommodated, and a limousine would pick up the customer, plus a limited amount of baggage at whatever place in the county, or the City of New York, was requested; delivery would be similar. If no passengers requested transit, applicant would "deadhead" to the other end to service return traffic. Applicant would operate from terminals in hotels in the respective cities.

Initially applicant proposed to operate with three limousines and to make three trips in each direction daily. Two limousines would be at Hartford, and one in New York, and in the event it proved to be necessary, both Hartford vehicles would be used to pick up passengers, those from one being transferred to the other for the main trip. Passengers to the south of the Hartford terminal within the county would be picked up en route. Pick-ups would be scheduled depending on where the passengers were located, timed so that the trip would start, after loading except for en route passengers, at a given time which might depend on the passengers' wishes.

Applicant's evidence before the hearing examiner consisted of testimony by its officer, James W. Munsie, concerning the proposed operations; of an accountant, concerning cost and revenue estimates and the financial affairs of applicant; and five travel agency witnesses and twenty-three members of the public who testified they would use the service, or recommend it, for a variety of reasons.

Following a resumé of the facts as they related to the proposal, the discussion of the Board began with a statement that it is incumbent upon applicant to establish a need for the proposed service. Then seemingly setting up the standard against which the proof is to be measured, it says: "Operations in limited capacity passenger vehicles which have been found to be required by the public convenience and necessity, and which are special operations within the meaning of § 207(a) of the act, come within one of the following categories:" (1) operations to and from resort areas; (2) airport-limousine service; and (3) a miscellaneous group involving service to special places of interest, such as to and from bingo games and race tracks.

The sense of the next paragraph of the report, as if measuring the proof against the stated standard of special operations, is found in the first two sentences:

"Essentially, what is proposed here, however, is an over-the-road service between major population centers. The only essential feature which distinguishes the proposed service from existing service [regular bus service] is applicant's proposal to render door-to-door pick-ups and deliveries of passengers." The Board concluded that "Although the features which applicant would offer might be attractive to a limited portion of the traveling public, we are not persuaded that they are so distinctive as to transform what is essentially a regular-route, point-to-point service into a new and specialized type of motor carrier operation for which there is a public demand."

This last sentence is the core of the Board's opinion. To say the least, it is ambiguous. It is unclear whether the proposed service is lacking in demand, or novelty, or both. Because of the comparatively extensive prefatory discussion of special operations, with emphasis on the similarities between proposed and existing service (and a hint of scepticism in passing about the feasibility of the door-to-door feature of the proposal), it

is certainly possible to imply that the Board held that the operation proposed by the plaintiff would not be a "special operation" and on this finding alone denied the application. But, there can be no doubt that this application does contemplate a special operation, since that category is a catch-all of services not ordinary or "charter," Crescent Express Lines, Inc. v. United States, 49 F.Supp. 92, 94 (S.D.N.Y.), aff'd, 320 U.S. 401, 64 S.Ct. 167, 88 L.Ed. 127 (1943); Brown's Bus Service, Inc., Extension-Intermediate Points, 83 M.C.C. 261, 264–265 (1960); The Arrow Line, Inc., 96 M.C.C. 1 (1964); Asbury Park-New York Transit Corp., 62 M.C.C. 731, 739–740 (1954), aff'd sub nom. Bingler Vacation Tours, Inc. v. United States, 132 F. Supp. 793 (D.N.J.), aff'd, 350 U.S. 921, 76 S.Ct. 211, 100 L.Ed. 806 (1955), and since the proposed service is *neither* over "a regular route or routes" nor "between fixed termini" (although lacking only one would do).

■ We, of course, recognize that the agency concerned with the implementation of transportation goals must of necessity balance the desirability of new and different types of service with the competitive impact that the introduction of such services will have on existing services. Trailways of New England, Inc. v. United States, 235 F.Supp. 509 (D.D.C. 1964). Within this sphere, both the factors of distinctiveness and competitive effect are weighed and considered. An adverse effect on competition may be a legitimate offset to a desire which has been shown. In resolving such conflicting considerations, there is, indeed, leeway given the Commission. However, it has been the practice to emphasize the economic impact when the proposed features are closely approximated by existing services and, on the contrary, when the application does suggest a truly new and desired concept to run the risk of some loss of business to established operations. See, e. g., Auclair Transp., Inc. v. United States, 221 F.Supp. 328 (D. Mass.1963), aff'd 376 U.S. 514, 84 S.Ct. 966, 11 L.Ed.2d 968 (1964); Great

Northern Ry. v. United States, 209 F. Supp. 238 (D.Minn.1962); Trailways of New England, Inc. v. United States, supra; Sinett v. United States, 136 F. Supp. 37 (D.N.J.1955); McBride's Express, Inc. v. United States, 173 F.Supp. 539 (E.D.Ill.1958); Robbins v. United States, 204 F.Supp. 78 (E.D.Pa.1962).

But why the present application was denied is an entirely different matter. Although concluding that present carriers were "adequate," a term sometimes used by the Commission to express a probability of adverse competitive impact, there is nothing in the remainder of the opinion to indicate a concern over possible inroads by the proposed limousine service into the bus lines' operations. If the record before the Board was inadequate, the constructiveness of the Board's decision is likewise so.

■ This much is clear enough. The citation by the Board to D. C. Transit System, Inc., Extension-Limousine Service, 81 M.C.C. 737 (1959), furnishes no support for an affirmative economic determination of "adequacy," if indeed it is possible to discern that such a determination was made in this case. *D. C. Transit* dealt with a very modest fare differential and attraction of luxury, on a route which was already served by specially equipped luxury buses. On the other side, the fare in the service proposed here is ostensibly not competitive with existing bus lines, even combined with taxi fares. Furthermore, the examiner found, "The evidence fairly precludes any conclusion that the proposed service would affect in any appreciable degree the present bus service of the protestants * * * this limousine service is intended to be and will continue to be a special and a premium service." There is, indeed, authority in the Board for independent reevaluation of the evidence, but where it disregards the facts which it expressly adopted, it ought, at the very least, afford the defeated party an explanation of why it has done so. Cf. Matlack v. United States, 119 F.Supp. 617 (E.D.Pa.1954).

While not explicitly pinning their decision on market considerations, the Com-

mission does play down the distinctive aspects of the proposal which distinguish it from the existing service, characterizing it as "essentially * * * an over-the-road service between major population centers." But this characterization does not alter the fact that there are aspects of the proposed service that are not presently available, the door-to-door delivery, the luxury accommodations, and the on-call, non-scheduled trips, and that there is ample testimony to show that such features are in demand. The Board does not supply us with any reasons for their apparent disregard of those appealing facets of Arrow Line's proposal.

Their opinion must be clarified if we are to rule, with any degree of certainty, that their action was not taken arbitrarily on the basis of irrelevant or inappropriate factors and standards. While the Commission's expert judgment is entitled to a wide range of discretion, especially as to public convenience and necessity, ICC v. Parker, 326 U.S. 60, 65, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945), it is not sufficient for it to cloak its decision in "administrative discretion." It has the continuing obligation to avoid the arbitrary exercise of its powers and the duty to stay within the confines of the statutory scheme. Schaffer Transp. Co. v. United States, 355 U.S. 83, 88, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957).

To assure the reviewing court that these minimal requirements have been complied with, "the Commission * * * must make sufficient explication to enable the parties and reviewing court to comprehend [its] actions. Eastern-Central Motor Carriers Association, Inc. v. United States, 321 U.S. 194 * * *." Sinett v. United States, supra, 136 F. Supp. at 40. Neither a detailed analysis nor an opinion written with especial proficiency is expected, Alabama Great Southern R. R. v. United States, 340 U.S. 216, 71 S.Ct. 264, 95 L.Ed. 225 (1951); but "[w]e must know what a decision means before the duty becomes ours to say whether it is right or wrong." United States v. Chicago, M., St. P. & Pac.

R. R., 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935).

The Commission's opinion presently under review is so drafted as to require speculation on our part if we are to pin down the theory on which the application was denied.

Reversed and remanded for further proceedings not inconsistent with this opinion.