HUDSON TRANSIT LINES, INC., et al.,
Plaintiffs,

and

The National Association of Motor Bus Owners, Plaintiff-Intervenor,

v.

UNITED STATES of America and the Interstate Commerce Commission,
Defendants,

and

Monarch Associates, Inc., Defendant-Intervenor.

Civ. Nos. 880–69, 904–69, 944–69, 956–69 and 962–69.

United States District Court,
D. New Jersey.

May 9, 1970.

See, also, D.C., 247 F.Supp. 985.

James F. X. O'Brien, Newark, N. J., for Hudson Transit Lines, Inc.

Richard J. Weiner, Hoboken, N. J., for Rockland Coaches, Inc.

Schreiber & Lancaster, Newark, N. J., for Manhattan Transit Co., and others.

William J. Hanlon, Edward F. Bowes, Newark, N. J., for Inter-City Transportation Co., Inc., and others.

Richard Fryling, Maplewood, N. J., for Public Service Coordinated Transport.

## OPINION

Before STAHL,* Circuit Judge, and AUGELLI and COHEN, District Judges.

COHEN, District Judge:

Plaintiffs, Hudson Transit Lines, Inc. and various other transportation companies, in these five consolidated actions, are interstate common carriers of passengers, operating buses in and beyond the metropolitan areas of New Jersey and New York. They, together with an intervening national trade association of bus owners, seek to set aside an order of the Interstate Commerce Commission issued May 2, 1968 to defendant-intervenor, Monarch Associates, Inc., a small family corporation, granting it a certificate of public convenience and necessity authorizing its continued operation of a car pool commuter transportation service over irregular routes, between points north of Highway No. 4, in Bergen County, New Jersey, and Manhattan, New York, and between Manhattan and Rockland County, New York. Monarch had been operating this car pool commuter service since early 1964, under the mistaken assumption that it was not subject to regulation by the Commission. Its commercial activities involved a pool of nine members, each of whom was required to enter into a one-year contract with Monarch, whereby he paid a flat weekly rate, regardless of his use of the

---

* Judge David Stahl heard the arguments and participated in the panel conference and decision of these consolidated cases prior to his untimely death.

service on any particular day of the five-day work week. The pool members selected a driver from among themselves, somewhat on a rotation basis, while for its part, Monarch supplied the motor vehicles and incurred all expenses including gas, tolls, parking charges, insurance, repair and maintenance.

Upon ascertainment that it was subject to ICC regulations, Monarch filed an application on June 26, 1964 with the Commission for a certificate of authority to conduct the type of passenger transportation here in issue. An Examiner conducted hearings on March 29 and 30, and on November 29 and 30, and December 1, 2 and 3, 1965 at New York City. Several common carriers and the intervening bus association opposed the application.[1] Twenty-three car pool commuters testified in support of the application, demonstrating their unanimous preference for Monarch's type of service over other available modes of commuter transportation.[2] These witnesses related at length their unhappy experiences with the use of bus service, e. g. routes not convenient to their residences and places of work, long waits, delays, lengthy time-consuming rides with overcrowded conditions and discomfort, etc. Many of these witnesses lived quite some distance from any regular bus stop—a mile or more. Significantly, most of them had been infrequent bus passengers and, prior to Monarch, used private car pools rather than buses. In fact, some of Monarch's present car pools consist largely of former members of long standing, privately organized

pools, who have taken advantage of Monarch's service to avoid tying up family automobiles. All witnesses testified that Monarch's service was faster, more convenient, easier to use, more congenial, more comfortable and, although more expensive than buses, well worth the difference. These witnesses asserted that if Monarch's service was discontinued, they would return to privately operated car pools rather than to public bus transportation.

By the end of the hearings in 1965, Monarch had organized and was operating 14 commuter groups serving a total of 112 members.[3]

By report and order of July 24, 1967, the Examiner recommended to the Commission that Monarch's operations were subject to regulation, but that in his opinion the application for a certificate of authority should be denied for lack of public convenience and necessity. He also concluded that Monarch was financially unable to comply with mandatory safety regulations requiring driver medical examinations and fitness reports and the maintenance of daily travel logs. Thereupon, Monarch filed exceptions and various protestants replied thereto.

The aforesaid report and order were reviewed by Division I of the Commission, which sustained the Examiner's finding that Monarch's activity was subject to ICC regulations, but adopted a contrary view regarding the public need and convenience for the issuance of a certificate of authority (107 M.C.C. 277). On May 2, 1968, the Commission granted authority[4] to Monarch to trans-

---

1. The transcript of those proceedings covers some 1,200 pages and there were as well nearly 100 exhibits.

2. It was stipulated by counsel for the parties, during the 1965 Commission hearings, that additional Monarch patrons would have testified to like effect in support of the application and that such testimony would be merely acumulative. Counsel for Hudson Transit Co. argued before us for a more limited effect to the stipulation. We do not consider the extent of the stipulation to be crucial to our review.

3. At the hearing before this Court, it was represented that Monarch was currently operating 19 car pools.

4. 49 U.S.C. § 307(a) " *   *   * [A] certificate shall be issued to any qualified application therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the

fer "passengers and their baggage, in round trip special operations, limited to the transportation of not more than nine passengers in any one vehicle, between points in Rockland County, New York and Bergen County, New Jersey, north of New Jersey Highway 4, on the one hand, and, on the other, points in the Borough of Manhattan, New York, N. Y."

Petitions for reconsideration were filed by various protestants, which were denied January 8, 1969, except that the Monarch certificate was corrected in order to eliminate the authority of transportation to and from points on New Jersey Highway No. 4. Reconsideration was again sought and once more denied by the Commission's order of May 2, 1969. Thereafter, new petitions were filed with the Commission seeking a declaration that the proceeding involved an issue of general transportation importance, which request was denied June 5, 1969. On July 30, 1969, the Commission issued its certificate authorizing Monarch's special operation over irregular routes, with an amendment providing for its automatic expiration after two years, subject to Monarch's right of reapplication.

The central issue to be here resolved is whether or not the Commission's decision is rational, is supported by substantial evidence, and whether it contains adequate findings upon which to support its conclusion.

The function of this Court, and the scope of its review, is limited to a determination of whether the Commission's findings are supported by substantial evidence contained in the record as a whole, and whether its conclusion as to the existence of a public convenience and necessity for Monarch's services, has a rational basis in fact and is permissible as a matter of law. Administrative Pro-

cedure Act, 5 U.S.C. § 706; Illinois Central Railroad Co. v. Norfolk & Western Railway Co., 385 U.S. 57, 66, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); Gilbertville Trucking Co., Inc. v. United States, 371 U.S. 115, 126, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962); Miss. Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S. Ct. 692, 78 L.Ed. 1260 (1934).

The Commission was created by Congress to act as the guardian of the public interest in matters of interstate transportation. Congress has entrusted it with a broad discretion, in the exercise of its expertise, for the grant or denial of authority for a particular operation provided, always, that there is warrant in the record. Accordingly, the Commission and not this court is the arbiter of the public interest. It is only if the action of the Commission is unwarranted in law or fact that "the reviewing court [has] authority to intervene. It cannot substitute its own view concerning what should be done. * * *" United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946). See also, Schaffer Transportation Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L. Ed.2d 117 (1957); Connecticut Limousine Service, Inc. v. United States, 295 F.Supp. 1335 (D.Conn.1969); Salem Transportation Co. v. United States, 285 F.Supp. 322 (S.D.N.Y.1969); National Bus Traffic Association v. United States, 284 F.Supp. 270 (N.D.Ill., E.D. 1967).

■ Gauging our review by the aforesaid norm, we conclude that a rational basis for the Commission's orders was amply contained in the record.

The Commission, in the clear exercise of its expertise and judgment, concluded that the certificate was justified because of Monarch's distinctive type of commuter service. The record before the

---

extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied: *Provided, however,* That no such certificate shall be issued to any com-

mon carrier of passengers by motor vehicle for operations over other than a regular route or routes, and between fixed termini, except as such carriers may be authorized to engage in special or charter operations." (Italics in original.)

Commission is replete with evidence that Monarch's special service was designed to and, in fact, did provide northern New Jersey and New York State daily commuters, employed in Manhattan, with a transportation facility, pursuant to an annual contract, under which rates were payable weekly, with a faster, more reliable, more comfortable, more convenient and more personalized means of transportation, clearly beyond the capacities of plaintiffs' existing carriers. As stated by the Commission:

"The proposed door-to-door service, with all expenses paid, eliminates the inconvenience experienced by commuters in transferring from one carrier to another, ofttimes accompanied by delays; the need of using private transportation or walking some distance to reach the existing service; and, will permit the passengers to enjoy all the comforts of personal transportation without the attendant disadvantages, a service which cannot be made available to the general public served by the protestants. Applicant desires * * * flexibility in choosing the least congested highways for entering or leaving New York City under various traffic conditions." (107 M.C.C. at 284–285).

The plaintiffs urge on this review that the Commission is not authorized by statute to classify regular commuter transportation as "special operations." [5] Plaintiffs would unduly restrict the Commission's classification under the statute. The phrase "special or charter operations" used therein is a "catchall" category. Arrow Line, Inc. v. United States, 256 F.Supp. 608 (D. Conn.1966); Asbury Park-New York Transit Corporation v. Bingler Vacation Tours, Inc., 62 M.C.C. 731 (1954), affirmed Bingler Vacation Tours, Inc. v. United States, 132 F.Supp. 793 (D.N.J. 1955), affirmed 350 U.S. 921, 76 S.Ct.

211, 100 L.Ed. 806 (1955). As was said by the Commission in *Bingler*, supra, "[i]t does not necessarily follow * * * that because an operation may appropriately be designed as 'special' that it may not also possess many of the characteristics of an 'ordinary regular-route operation.'" The Commission's broad discretion to decide that a particular service is a special operation under the statute need only be exercised rationally. We think the Commission has met this standard here by validly differentiating Monarch's service from that offered by the plaintiffs.

Furthermore, contrary to the argument advanced by plaintiffs, the statutory provision of special or charter operation over irregular routes does not defeat the National Transportation policy of protecting regular carriers against competing carriers using irregular routes. For Monarch's special service over irregular routes is not destructive competition with regular route bus carriers, nor does it do violence to the rule in Lincoln Tunnel Application, 12 M.C.C. 184 (1939), which restricted commuter carriers in the metropolitan New York-New Jersey areas to fixed routes in order to reasonably assure stability of schedules and to prevent a destructive competitive search for customers over irregular routes.

Generally speaking, it is true, as also urged by plaintiffs, that before granting a certificate of authority the Commission must evaluate public convenience and necessity. It must also consider the economic health of existing carriers before certifying operations competing for the same general traffic. United States v. Dixie Highway Express, Inc., 389 U.S. 409, 88 S.Ct 539, 19 L.Ed.2d 639 (1967). However, *Dixie* points out that even carriers who can adequately meet public transportation needs have no right to freeze out com-

---

5. Section 207(a) of the Interstate Commerce Act, 49 U.S.C.A. § 307(a), provides in pertinent part: "That no such certificate shall be issued to any common carrier of passengers by motor vehicle for operations over other than a regular route or routes, and between fixed termini, *except as such carriers may be authorized to engage in special or charter operations.*" (Emphasis added.)

petitors in the areas which they have been servicing. The mere fact that plaintiffs' carriers may have lost, or may lose in the future, revenue as a consequence of Monarch's service does not rob the Commission's determination of public necessity and convenience of its validity. So that even if the Commission had found plaintiffs' service adequate, which it did not, it was still at liberty to issue a certificate for public convenience and necessity, as it did. Norfolk Southern Bus Corp. v. United States, 96 F.Supp. 756 (E.D.Va.1950) affirmed per curiam, 340 U.S. 802, 71 S.Ct. 68, 95 L.Ed. 590 (1950). This is especially true here, where the Commission concluded that Monarch's operations were essentially different from those of the plaintiffs. The Commission did no more than evaluate the public transportation needs and resources in a particular case, as required by Congress and the National Transportation Policy. As stated in Schaffer Transportation Co. v. United States, supra, 355 U.S. at page 91, 78 S.Ct. at page 178 (1957):

> "No carrier is entitled to protection from competition in the continuance of a service that fails to meet a public need, nor, by the same token, should the public be deprived of a new and improved service because it may divert some traffic from other carriers."

█ Nor can we say that the Commission acted without proper and adequate evidence insofar as it authorized Monarch to operate in specific communities and areas within the overall Bergen and Rockland Counties, as to which little or no testimony was offered. Plaintiffs argue that only two witnesses residing within Bergen County testified for Monarch and that consequently, there was no evidence upon which to base a finding of public need. This argument, of course, ignores the stipulation regarding cumulative testimony referred to in marginal note 2, ante. An applicant need not produce testimony indicating a need at each and every point within a given service area because "* * * testimony as to specific need at a representative number of points in the area * * * was sufficient to support an inference of need at other points within the area as to which no specific testimony was offered." Atlanta-New Orleans Motor Freight Co. v. United States, 197 F. Supp. 364, 369 (N.D.Ga.1961). Moreover, since the application sought to serve the entire area, " * * * the Commission was justified in expressing its ultimate findings in relation to the 'total situation' existing in the disputed area." Atlanta-New Orleans, etc., see also, Connecticut Limousine Service, Inc., supra. The inference arising from the evidence which Monarch did offer was not rebutted, and it was, in the opinion of the Commission as it is of this Court, adequate upon which to base its finding. Cf: American Farm Lines v. Black Ball, et al., 396 U.S. 884, 90 S. Ct. 173, 24 L.Ed.2d 159, decided April 20, 1970. Obviously, the Commission considered the areas of operation as a whole and deduced that the conditions prevailing in the representative parts existed generally throughout the entire area served.

█ The plaintiffs contend further that there was no factual showing that Monarch could comply with ICC safety regulations. True, the record discloses that in the past Monarch did not require its patron-drivers to undergo medical examinations for fitness or to file transportation logs and mechanical maintenance and inspection reports. However, the record also shows that Monarch did not consider it was subject to ICC regulations, but that when it realized its error it sought a certificate of authority by filing its application therefor, thus indicating its willingness and ability to comply. Under such circumstances, we cannot say that the Commission's findings as to fitness and ability, on the whole record, were inadequate. American Farm Lines, supra; United States v. Pierce Auto Freight Lines, Inc., supra. Furthermore, the Commission may properly fix a time limitation, as it did, on a certificate to assure compliance with its public safety regulations. Gate-

way Transportation Co. v. United States, 173 F.Supp. 822 (W.D.Wis.1959).

The last specification of error assigned by the plaintiffs is that the certificate issued, even if proper, nevertheless lacks requisite specific description of the type and area of service authorized.[6] They urge that since the only limitation placed upon the certificate of the round-trip service areas was that it be confined to nine-passenger vehicles, Monarch could actually engage in a small scale bus type of operation in direct competition with them, without any demonstrated public need and convenience. We agree that with respect to specificity, the certificate fails to particularize the special operation for which the Commission found public need and convenience. As was amply established in the record, Monarch's operation is unique, in that it is essentially an organized public commercial car pool for working commuters functioning by way of private contracts. It is no answer to say that evidence in the record restricts its operation. As was aptly stated in Refrigerated Transport Co. v. United States, 214 F.Supp. 536 (N.D.Ga.1963), at page 540:

"The Commission, and * * * intervening defendant, attempt to justify the grant as being impliedly limited by the language in the report of the Commission. This will not do in view of the established principle of law that certificates of public convenience and necessity speak for themselves and extraneous or antecedent facts may not be looked to in the absence of patent ambiguity or indefiniteness in the certificate. Andrew G. Nelson, Inc. v. United States et al.,

1958, 355 U.S. 554, 78 S.Ct. 496, 2 L. Ed.2d 484. * * *"

Certainly, the Commission possesses sufficient expertise and artistry to couch its certificate of authority in such terms and language as not to deprive the special operation of its unique nature and flexible characteristics. The Commission's fear that this might unduly interfere with its rule making program, which is now in process regarding special operation certificates, is of course of vital concern, American Commercial Lines, Inc. v. Louisville & Nashville R. Co., 392 U.S. 571, 592, 88 S.Ct. 2105, 20 L.Ed.2d 1289 (1968). However, we believe that such an administrative problem cannot justify a certificate under which Monarch might engage in nonunique operations and for which there was no showing of public convenience and necessity. *See*: Drum Transport, Inc. v. United States, 298 F.Supp. 667 (S.D.Ill.1969). As stated in *Refrigerated Transport Co.*, supra, 214 F.Supp. at page 539:

"Since, however, the entire application was premised on a need for [a particular service] and the authority granted is not restricted to this end, we must remand for the imposition of a proper restriction. Else, the whole case fails as there is no rational basis of record for any order granting authority for service beyond that sought."

In drafting the final certificate upon remand, the guidelines have been established by the Commission itself, as expressly set forth in Irving Nudelman Common Carrier Application, 28 M.C.C. 91, 96 (1941).

"[A]pplicants here have predicated their showing of public convenience

---

6. Section 208(a) of the Interstate Commerce Act, 49 U.S.C.A. § 308(a), provides in pertinent part: "Any certificate issued under section 306 or 307 of this title shall specify the service to be rendered and the routes over which, the fixed termini, if any, between which, and the intermediate and off-route points, if any, at which, and in case of operations not over specified routes or between

fixed termini, the territory within which, the motor carrier is authorized to operate; and there shall, at the time of issuance and from time to time thereafter, be attached to the exercise of the privileges granted by the certificate *such reasonable terms, conditions, and limitations as the public convenience and necessity may from time to time require.* * * *" (Emphasis added.)

and necessity primarily on the premise that they have been, and desire to continue, performing a service which is essentially dissimilar to that performed by ordinary bus and rail lines. Obviously, we may only issue a certificate of public convenience and necessity to the extent that the evidence shows a need for the service under consideration. * * * [A]ny authority granted herein should be limited in such a way as to prevent them from instituting a service competitive with those of protestants and other common carriers, and different from that which they have been performing."

Accordingly, we remand this matter to the Commission for it to impose appropriate restrictions upon Monarch's certificate of authority.

The plaintiffs' prayers for relief in all other respects are denied.