**HUDSON TRANSIT LINES, INC., Petitioner,**

v.

**UNITED STATES of America, the Interstate Commerce Commission, and Monsey Transportation Corp., Respondents.**

**No. 1110, Docket 77–4033.**

United States Court of Appeals, Second Circuit.

Argued May 26, 1977.

Decided Sept. 15, 1977.

Rachel B. Backer, New York City (Harvey L. Strelzin, New York City, of counsel), for respondent Monsey Transp. Corp.

Before FEINBERG and DANAHER *, Circuit Judges, and DOOLING **, District Judge.

DOOLING, District Judge:

Respondent Monsey Transportation Corp. in July 1975 applied for authority to engage in operation, in interstate commerce, as a contract carrier by motor vehicle over regular routes in the transportation of passengers with their hand baggage in special or charter operations with Chassidic Jews and religious groups, organizations, congregations and synagogues of the Chassidic Jewish sect. See 49 U.S.C. §§ 303(a), 309(a)(1). Two routes were described. One embraced transportation from five points in Monsey, New York, to two points in Brooklyn and two in Manhattan and return. The other covered transportation from five or six points in Monsey to one point in upper Manhattan and return. The routes of travel were described with particularity; they included travel through New Jersey. At the opening of the hearing on the application before Administrative Law Judge J. Lee Benice on April 20, 1976, Monsey Transportation amended the application to request authority to operate as a contract carrier over irregular routes transporting passengers with their baggage between a described area in Monsey and five points in New York City, three of them in Manhattan and two in Brooklyn—

". . . under continuing contracts with Jewish Orthodox congregations and Yeshivas located in the described Monsey area; with transportation restricted to members of said congregations and Yeshivas."

Upon the acceptance of the amendment by Judge Benice, the protests of Rockland Coaches, Inc., Transport of New Jersey and Hudson Transit Lines, Inc. were withdrawn; all three protestants remained par-

Samuel B. Zinder, Great Neck, N. Y., for petitioner.

Kenneth P. Kolson, New York City (Mark L. Evans, Gen. Counsel, I. C. C., Donald I. Baker, Asst. Atty. Gen., Washington, D. C., and Andrea Limmer, Rochester, N. Y., of counsel), for the Interstate Commerce Commission and the United States.

* Of the District of Columbia Circuit, sitting by designation.

** Of the Eastern District of New York, sitting by designation.

ties of record for the purpose of receiving notice of further proceedings in the case.

The evidence at the hearing was that Monsey is an unincorporated village about twenty-two miles from New York City. It was founded by Orthodox Jewish families from New York City, and at the time of the hearing in 1976 about 2,500 Orthodox Jewish families lived in Monsey. They made up the greater part of the village's population, which was 8,797 in 1970. Most of the working people in Monsey do not have skills for which they can find employment in or near Monsey; they must commute to jobs in New York City, in the needle trades and in related industry, in the diamond center and in small peddler firms. Most of them do not own automobiles, and the nearest established common carrier bus route is two or three miles from Monsey. Residents who work in the city get there by using car pools, in "mini-buses" arranged by some of the congregations, or by getting to the nearest bus station by any means that are at hand. Commutation for the working population is expensive, time-wasting, and, as two of the witnesses described it, a "hassle."

There are about thirty-two Orthodox Jewish congregations in Monsey, a great many but not all of them Chassidic (or Hassidic) congregations, and there are a number of associated Yeshivas. The congregations vary in membership from as few as thirty to as many as two hundred fifty. The applicant's principal officer testified that the congregations were prepared to contract with the applicant for the planned bus service. No service other than that for families of the members of the congregations was contemplated. According to Orthodox Jewish custom men and women passengers would be seated separately, men on one side, women on the other. Seating provision would be made for passengers who wished to read prayers or to study in transit.

There would be no bus service on Saturday, the Sabbath. On Friday, the buses would return to Monsey several hours before sundown.

The Administrative Law Judge found that the applicant would provide a unique and highly specialized service designed to meet the peculiar transportation needs of the Orthodox Jewish Community in Monsey, a community constituting nearly the entire population of Monsey; found that the people absolutely require a bus service to and from their New York City jobs that will be consistent with their religious beliefs and customs; found that religious practices of the Monsey people are so incompatible with common carriage and normal bus operations of existing carriers that the carriers have declined to provide the service; found that the operation would be almost perfectly balanced and would be economically feasible, that the applicant is fit, willing, able and uniquely qualified to provide the service, that existing carriers would be unaffected by the grant of authority to applicant and that denial of the grant would be harmful to the prospective passengers and would result in substitute methods of transportation that are less efficient and are wasteful of fuel. Judge Benice reasoned that the grant contemplated would provide the greatest flexibility of service while retaining the essential character of contract carriage. The contracting congregations were not to be named in the permit; to do so would be burdensome, and it would require the obtaining of new authority each time a congregation was dropped, added, or merged into another. The decision continued,

"It should also be noted that the total number of contracting organizations could reach a substantial figure and thereby suggest to some (aware of the decision in *Umthun Trucking Co. Ext.— Phosphatic Feed Supplements,* 91 M.C.C. 691) that the operation had lost its character as a contract carriage operation. However, it is apparent from a close examination of the *Umthun* case (see *Umthun, supra,* at 696 and 697) and from a close examination of both the authority that will be granted and the nature of the operation that is to be conducted, that as long as the limitations in the permit are observed, the operation will necessari-

ly retain the character of contract carriage and will be wholly irreconcilable with common carriage."

The ultimate finding and the order were that operation as a contract carrier over irregular routes transporting passengers and their baggage between a described area in Monsey and five points in New York City, three in Manhattan and two in Brooklyn, "under continuing contracts with Jewish orthodox congregations and Yeshivas located in the described Monsey area; with transportation restricted to members of said congregations and yeshivas; will be consistent with the public interest and the national transportation policy"; that applicant was qualified to provide the service in conformity with the Interstate Commerce Act and the regulations of the Commission; and that "an appropriate permit should be issued."

There were no exceptions to the initial decision, but Review Board No. 2 stayed the order and, two weeks later, modified it materially. The Board decided that Judge Benice's decision granting the applicant contract carrier authority to transport passengers under continuing contracts with "an unlimited number of unnamed 'Jewish orthodox congregations or yeshivas' . . should be modified." It decided that, on the facts, if applicant contracted with each of the thirty-two congregations and with the yeshivas for transportation service and performed operations under the contracts " . . . it could not be considered as engaging in transportation for a 'limited number of persons' as specified in the contract carrier definition of section 203(a)(15) of the Interstate Commerce Act [49 U.S.C. § 303(a)(15)]; that the operations proposed by applicant and shown to be required by the supporting witnesses may be described more appropriately in terms of motor common carrier special and charter operations; that the record amply shows the latter service

to be required by the public convenience and necessity; and that said authority will be granted in lieu of the contract carriage recommended by the Administrative Law Judge . . . ."

The Board by the "Appendix" to its order modified the description of the service authorized to cover operation as a common carrier by motor vehicle over irregular routes of passengers with their baggage "in special and charter operations, beginning and ending at Monsey, N.Y., and extending to points in New York and Kings Counties, N.Y."

The Board emphasized that its authorization of the proposed service was based solely on Applicant's willingness, and existing carriers' apparent inability or unwillingness,

". . . to respond to the specialized needs of that segment of the public represented by the supporting witnesses; that no preferential treatment based on religious or ethnic factors is conferred or intended by our grant of authority herein; and that the Commission has stated that where existing carriers are not providing an adequate service to any particular segments of the public, a grant of authority to cure this defect does not evince a discriminatory policy but is, instead, an award designed to provide a needed service, cf. *Elegante Tours, Inc.— Broker Application*, 113 M.C.C. 156, 160 (1971) . . . ."

The Board found that the applicant had failed to establish that it was "fit, willing and able properly to perform the service of a contract carrier" as defined in 49 U.S.C. § 303(a)(15) and to comply with the Interstate Commerce Act and the Regulations under it and, therefore, denial of the contract carrier application was required under 49 U.S.C. § 309(b).[1] Finally the Board found that in substance the service proposed was a common carrier service, that

---

1. Section 309(b) authorizes issuance of a contract carrier permit to any qualified applicant authorizing all or part of the operations applied for "if it appears from the applications or . . hearing[s] . . . that the applicant is fit,

willing and able properly to perform the service . . . and to conform to the provisions of this chapter and the lawful requirements, rules and regulations of the Commission thereunder . . . ."

the public convenience and necessity required the operation by applicant of the service described in the Appendix, and that an appropriate certificate should be granted. The grant of the order implied also a finding under 49 U.S.C. § 307(a) that the applicant was "fit, willing and able properly to perform the service . . . and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder . . . ."

Because of the change in proposed service a notice of the authority actually granted to the applicant was published in the Federal Register of August 19, 1976 (41 F.R. 35113). Meanwhile, Rockland Coaches, Inc., petitioned for reconsideration and later Hudson Transit Lines, Inc., petitioned for reconsideration and National Bus Traffic Association petitioned for leave to intervene and, thereupon, for reconsideration. The Commission, Division 1, acting as an Appellate Division, denied the petitions on the ground that the findings of Review Board No. 2 were in accordance with the evidence and applicable law. Hudson Transit then petitioned the Commission for a finding that the issues were of general transportation importance (49 C.F.R. § 1100.101(a)(2), (3), 49 U.S.C. § 17(6)), and the petition was denied. A petition by National Bus Traffic Association for reconsideration of the denial of its petitions was likewise denied.

On March 15, 1977, the Commission issued a certificate of public convenience and necessity to Monsey. The final language of the certificate is

"AND IT IS FURTHER ORDERED, That the transportation service to be performed by the said carrier in interstate or foreign commerce shall be as specified below:
"IRREGULAR ROUTES:
Passengers and their baggage, in the same vehicle with passengers, in special and charter operations;
Beginning and ending at Monsey, N.Y., and extending to points in New York and Kings Counties, N.Y."

The decision of the Commission rejecting the Administrative Law Judge's recommendation relies essentially on the conclusion that the proposed service was not for "a limited number of persons." The Commission appeared to accept the idea that there was no ethnic or religious discrimination involved in authorizing a service that suited the special and unserved need of the Orthodox Jewish Congregations of Monsey. In *Elegante Tours, Inc.*, 1971, 113 M.C.C. 156, 162, it had been said that

"Because a certain class of users of a proposed service may happen to be, for the most part, members of an ethnic or racial minority group, does not mean that a grant of authority arising from their support of an application constitutes a discriminatory grant. Rather, a grant of authority is forthcoming only because the needs of this particular class of users for a needed transportation service are not being fully satisfied by existing services."

The first and dispositive question is whether Section 303(a)(15) has been read correctly by the Commission, for it appears that the Commission would have granted the permit if it had agreed that the described service was for a "limited number of persons." That depended on the interpretation of Section 303(a)(15), and that interpretation was bound up with the history of the section.

Before 1957 common and contract motor carriers were defined in the following language (49 U.S.C. § 303(a)):

"(14) The term "common carrier by motor vehicle" means any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes . . .

"(15) The term "contract carrier by motor vehicle" means any person which, under individual contracts or agreements, engages in the transportation (other than transportation referred to in paragraph (14) of this section . . . ) by motor vehicle of passengers or property in interstate or foreign commerce for compensation."

A third, hybrid type of carrier was implied by certain language in Section 307(a). That section covers the issuance to common carriers by motor vehicle of certificates of public convenience and necessity authorizing service over regular routes between fixed termini; subsection (a) then concludes

"*Provided, however,* That no such certificate shall be issued to any common carrier of passengers by motor vehicle for operations over other than a regular route or routes, and between fixed termini, except as such carriers may be authorized to engage in special or charter operations."

*United States v. Contract Steel Carriers, Inc.,* 1956, 350 U.S. 409, 411, 76 S.Ct. 461, 463, 100 L.Ed. 482, considered the meaning of Section 303(a)(15) in the light of the Commission's earlier view that "the services of a contract carrier must be individual and specialized," a view, the Court said, having support in legislative history. The Court held that the service Contract Steel Carriers offered by its uniform contracts with sixty-nine shippers was sufficiently specialized, saying (at 411, 76 S.Ct. at 463)

". . . if specialization is to be read into 49 U.S.C. § 303(a)(15) by the legislative history, it is satisfied here since appellee hauls only strictly limited types of steel products under individual and continuing contractual agreements with a comparatively small number of shippers throughout a large area."

The Court rejected the contention that appellee's aggressive acquisition of new shipper accounts amounted to its so holding itself out to the general public that it became a common carrier, relying, evidently, on the proviso of Section 309(b) (relating to the issuance of contract carrier permits), which then stated that no terms in the permit should restrict the contract carrier's right "to substitute or add contracts within the scope of the permit, or to add . . . facilities, within the scope of the permit, as the development of the business and the demands of the public may require."

Arguing that the *Contract Steel Carriers* holding that contract carriers were free to search aggressively for new business within the limits of their permits would tend to obliterate the distinction that the Congress intended to draw between common and contract carriers, the Chairman of the Commission urged Congress to amend the definition of contract carrier and certain related sections of the Act. Senate Report No. 703, 85th Cong. 1st Sess., 2 U.S.Code Cong. and Adm.News 1599, 1601 (1957). In 1957 the Congress enacted changes along the lines of those requested by the Commission. Section 303(a)(15) was amended to read

"(15) The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation (other than transportation referred to in paragraph (14) of this subsection and the exception therein), under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

Section 309(b) was also amended to add a sentence requiring the Commission, in determining whether or not to issue a contract carrier permit, among other things to "consider the number of shippers to be served by the applicant, [and] the nature of the service proposed." The language of Section 309(b) relating to the terms of the permits was considerably altered. The language underlined in the following quotation was introduced in the 1957 amendment.

". . . The Commission shall specify in the permit the business of the contract carrier covered thereby and the scope thereof, and *it* shall attach to it at the time of issuance, and from time to time thereafter, such reasonable terms, conditions, and limitations, consistent with the character of the holder as a contract carrier, *including terms, conditions and limitations respecting the person or persons*

*and the number or class thereof for which the contract carrier may perform transportation service,* as may be necessary *to assure that the business is that of a contract carrier and within the scope of the permit,* and to carry out with respect to the operation of such carrier the requirements established by the Commission under section 304(a)(2) and (6) of this title: *Provided,* That within the scope of the permit *and any terms, conditions or limitations attached thereto,* the carrier shall have the right to substitute or add to its equipment and facilities as the development of its business may require: *Provided further,* That no terms, conditions or limitations shall be imposed in any permit issued on or before August 22, 1957 which shall restrict the right of the carrier to substitute similar contracts within the scope of such permit; or to add contracts within the scope of such permit *unless upon investigation on its own motion or petition of an interested carrier the Commission shall find that the scope of the additional operations of the carrier is not confined to those of a contract carrier as defined in section 303(a)(15) of this title, as in force on and after August 22, 1957.*"

The amended proviso language deleted the expression "as . . . the demands of the public may require" altogether.

The expression "a limited number of persons" is not further defined in the statute. It is not clear from the bare words whether the expression means that the contract carrier can serve only a few persons, or that the Commission's permit must in some form limit the persons to be served, or means that those served must constitute a class identified by a specialized transportation need. It is not easy to suppose that the Congress meant to empower the Commission to fix a simple numerical limit; if that had been intended, the Congress could itself easily have imposed a numerical limit. And the second proviso of amended Section 309(b), in addition to permitting substitution of contracts within the scope of the permit, also permits the carrier to add contracts within the scope of the permit unless the Commission finds "that the scope of the

additional operations of the carrier is not confined to those of a contract carrier."

The legislative history does not, certainly, exclude the idea that it was intended that the Commission could impose a numerical limit in granting a permit. Indeed, Section 309(b) empowers the Commission to include in the contract carrier's permit limitations respecting the number or class of persons for which the carrier may perform transportation service as may be necessary to assure that the business is that of a contract carrier and is within the scope of the permit.

▮ But the intention of the Congress was more complex. The bill which ultimately became the law amending Sections 303(a)(15) and 309(b) would have defined a contract carrier as one which conducts its business other than as a common carrier and

"under continuing contracts with one person or a limited number of persons for the furnishing of transportation services of a special and individual nature required by the customer and not provided by common carriers."

That formulation was found by the Senate Committee to "be unduly restrictive on contract carriage." See Senate Report No. 703, at 2 U.S.Code Cong. & Admin.News 1600–1601 (1957). The Commission and the Department of Commerce indicated that it should not be necessary to show that existing common carriers were unwilling or unable to render the type of service involved. *Id.* at 1601, 1602–3.

The Chairman of the Commission in his testimony before the senate committee indicated that the Commission's difficulty with the *Contract Steel Carrier's* case was that the freedom which it granted to carriers to solicit customers "without restriction as to specialized service" would tend to obliterate the intended distinction between common and contract carriers (*Id.* at 1601). The critical element, then, was specialized service; the tendency to assimilate specialization of service to fewness in number of persons served does not mean that one im-

plies the other, nor that either factor can be taken alone as determining the contract carrier issue. *Noble v. United States*, 1943, 319 U.S. 88, 63 S.Ct. 950, 87 L.Ed. 1277, had earlier made clear that a service under special contracts with a few shippers in one industry could become a common carrier service if the carrier offered to carry for all any or all of the commodities carried for any of the special contract shippers; *Noble* implied that carrying a class of commodities could be either common carriage or contract carriage depending on whether the shippers were few and the service was under special contracts, or the class-of-commodities service was offered to the general public.

■ *Armored Motor Service Co., Inc., Conversion Proceeding*, 1958, 77 M.C.C. 433 is illustrative. It involved the determination under 49 U.S.C. § 312(c) of the status of existing armored car services in the light of the amendment of Section 303(a)(15). The respondent companies served from seven to 314 shippers. The Commission (Division 1) referred to the legislative changes that the Commission had proposed and said (at 437–438)

"In commenting on the proposals it was noted that the amendments were needed to preserve the distinction between contract and common carriage, that freedom to solicit customers on the part of contract carriers without a restriction to specialized service would obliterate the distinction between the two categories of carriage, and that the proposals were intended to insure that all contractual arrangements of contract carriers would cover only individual specialized service. Relying on these stated objectives, there would appear to be little reason for any change in these respondents' status. Historically, too, armored-car operators have not been considered as competitors to common carriers, or, for that matter, to other contract carriers, and their operations consistently have been found to be those of contract carriers, even though it has been known that the number of persons served often was considerable.

\* \* \* \* \* \*

"Aside from this consideration, however, it must be determined whether respondents' operations meet the test of the statutory definition. Certainly their service is unique, specialized both in the matter of equipment and in service. There is no doubt too that such service is designed to meet the distinct need of each individual customer, for there appears to be no argument that their service varies from customer to customer. Do then respondents serve a 'limited number of persons' as specified in the definition? Though at first blush, the answer would appear to be in the negative, *the term, 'limited number' does not necessarily require an arbitrary figure which must be constant and not exceeded; rather it is one within our discretion to fix.* In determining this figure, it is proper that consideration be given to factors and circumstances surrounding a particular operation or type of motor-carrier service. Here, *respondents provide a tailormade transportation service for particular customers under individual continuing contracts.* As part of such service, they furnished police protection to safeguard the commodities entrusted to their care. All of their customers have a need for such service in transporting their valuables, but, in addition, each has individual requirements relating to the transportation of the considered commodities which are peculiar to its business and respondents conduct their operations in a manner calculated to satisfy such demands. The unusual and highly specialized service purveyed by respondents is actually confined to a limited class of customers so that respondents properly can be considered as serving a 'limited number of persons,' of contract carriage as set forth in the act." (Emphasis added.)

The "discretion" to which Division 1 referred could not be arbitrary; it necessarily means a reasoned judgment based upon such factors as the language of the statute implies—"distinct need of each individual customer," "continuing contracts," and "limited number of persons." In *Armored*

*Motor Service* the dominant factor was specialized service for a particularized transportation need, but the class served, although notionally innumerable, was limited by the precision of the definition of the service needs of the class.

*Armored Motor Service Co.* indicated that the Commission would be guided solely by the facts peculiar to the particular carrier's operations as they relate to the determination of status and that the *Armored Motor Service* decision would not control where the facts were materially different. *Umthun Trucking Co. Extension—Phosphatic Feed Supplements*, 1962, 91 M.C.C. 691, referred to by the Administrative Law Judge in the present case, dealt with a carrier operating an assigned truck service in the carriage of a very limited range of commodities. In denying Umthun contract carrier status, the Commission, Division 1, referred to *Armored Motor Service Co.* and another case and said (at 697)

"Those contract carriers whose services do not possess such a high degree of specialization, however, are hereby put on notice that their attempts to expand their operations by offering service to more than six or eight separate shippers will be scrutinized with great care to insure that they are not thereby placing themselves in a position to serve more than the limited number of persons permitted them by section 203(a)(15) of the act. The obvious course open to a carrier, such as applicant herein, whose operations enlarge so that it serves more than a limited number of persons is to seek conversion to common carrier status through an appropriate application filed under section 207 of the act."

Umthun's contracts, as stated in the report, involved only ordinary carriage of common commodities. The service involved no special transportation features.

The Commission reviewed the contract carrier cases fully in *Armored Carrier Corp. Extension—Vermont*, 1963, 92 M.C.C. 336, and said (at 358):

"Since the amendment of the contract carrier definition, the Commission has generally limited a contract carrier grant of authority to services to be provided for a named shipper. Nevertheless, we have found in certain instances, where a highly specialized service was involved, that a definable or closely related group of shippers might properly be considered a 'limited number of persons.' This finding has been made with respect to the operations of armored carriers, whether of coin and bullion or commercial papers of no inherent value, and such carriers have been granted authority limited to service performed under contract with, for example, banks and banking institutions. Also, armored-car operators have been granted authority without any restriction as to the class of shipper they may serve under the theory, outlined in our discussion of the *Michigan Pickle* case [77 M.C.C. 549], *supra*, that the service they would provide was so highly specialized and unique *as to be necessarily available only to a limited class of customers*." (Emphasis in original.)

The Commission, referring to the finding in *Armored Motor Service Co.* that the carriers were contract and not common carriers, said (at 359):

"This conclusion was based primarily on the finding that highly specialized, protective services were provided. For the reasons given in that report, we too are convinced that such protective services were correctly classified as contract carriage, and that, *where the carrier providing them limits its operations to those performed under contract with a clearly definable class of shippers, such as banks and banking institutions, it may properly be found to be in compliance with the statutory requirement that it serve only a 'limited number' of persons.* However, we are also convinced that the report in the *Armored Motor Service Co., Inc., Conversion* case failed to give sufficient consideration to the dissimilarity between what may be called the traditional type of protective armored service provided by the majority of the respondents, on the one hand, and, on the other, the transportation of business documents and various

other items not of inherent value, provided by carriers such as A.C.C., one of the respondents in that case." (Emphasis supplied.)

In the present case Review Board No. 2 emphasized that its authorization of common carrier service in special and charter operations "is based solely on applicant's willingness, and existing carriers' apparent inability or unwillingness, to respond *to the specialized needs of the segment of the public represented by the supporting witnesses*" (emphasis supplied). In resting its rejection of the Administrative Law Judge's decision solely on the supposed failure of applicant's proposed service to meet the "limited number of persons" requirement of Section 303(a)(15), Review Board No. 2 (and Division 1, in affirming it) wholly failed to apply in Monsey's case the Commission's own rules governing the case in which a highly specialized service is provided for a clearly defined class. *Cf. Michigan Pickle Co., Common Carrier Application*, 1958, 77 M.C.C. 549, 553. The very terms in which Review Board No. 2 modified the Administrative Law Judge's decision, with its emphasis on the "specialized needs" of a "segment" of the public, in principle required affirmance of Judge Benice's decision. Certainly there is no suggestion that a change in Commission rules of decision was intended; it appears, rather, that the Armored Motor Service Co. line of cases was, however unaccountably, overlooked.

The substitution of a common carrier certificate authorizing carriage over irregular routes "in special and charter operations" is not supportable on the record. The need, clearly described and found both by the Administrative Law Judge and by Review Board No. 2, is the antithesis of a need for common carrier service. The case was not concerned with establishing a common carrier bus service between Monsey and New York City. The common carriers who appeared to protest were competent, if not willing, to render such a service. The different service needed, which common carriers were found unable or unwilling to perform, was the specialized service the applicant proposed, a service which met those individualized needs of the Orthodox Jewish segment of the public in Monsey that common carrier service could not meet. How inapt to the need to be served a common carrier service must be is apparent from the fact that, if the applicant were in a real sense a common carrier, it would have to serve the Monsey community and not the specialized need of the supporting witnesses. *Cf. Restrictions on Service by Motor Carriers*, 1970, 111 M.C.C. 151, 163–164, 169–170, 175.

The uncertain contour of Section 307(a) "special or charter operations" as applied to the carriage of passengers is clear from the sketch of the coverage of the term in *Arrow Stage Lines, Inc., Investigation and Revocation*, 1964, 96 M.C.C. 572, 578–579 where Division 1 explained (citations omitted):

"There are three recognized types of passenger service: (1) the ordinary, day-to-day, scheduled, regular-route common carriage of passengers; (2) charter operations in which a group organized by someone other than the carrier is sold the exclusive use of a vehicle; and (3) 'special' operations, which are not defined but include all passenger operations which do not fall into either of the other two classes. . . . It has long been recognized that there is a definite distinction between charter and special operations. Charter service is characterized by the existence of a collective contract or charter for the exclusive use of the vehicle by a complete, cohesive, homogeneous group. Conversely, special operations include the various kinds of operations which are neither charter service nor the usual operations of the ordinary regular-route common carriers of passengers, and involve the sale of tickets by the carrier to each individual passenger. . . . The Commission, in *Fordham Bus Corp. Common Carrier Application*, 29 M.C.C. 293, a leading case in this area, stated at page 297 that special service—contemplates that service rendered generally on weekends, holidays, or other special occasions to a number of passengers which the carrier itself has assembled into a travel

group through its own sales to each individual passenger of a ticket covering a particular trip or tour planned or arranged by the carrier.

"From the beginning of motor carrier regulation there have been repeated and numerous grants of authority to carriers authorizing the transportation of passengers in 'special' operations of one type or another. Probably the most common of the authorized 'special' operations has been operation in 'round-trip sightseeing or pleasure tours.' It is well established that such operations differ materially from the usual operations of regular-route common carriers of passengers in that special operations are designed especially to meet the needs of individual sightseers or tourists, and not to serve persons requiring expeditious service between particular points."

The Commission's regulations, in differentiating the special and charter operations of Section 307(a) from those of Section 308(c), require that the "special or charter operations" of Section 307(a), those presumably intended in the present case, "be limited strictly to the authority described in the certificate of each carrier so engaged" (49 C.F.R. § 1054.1(b)).

 The certificate in the present case neither embraces such a service as is usually covered in "special or charter operations" (*cf. Passenger Transportation in Special Operations*, 1970, 112 M.C.C. 160), nor describes the service intended to be authorized. The opinions of the Administrative Law Judge and of Review Board No. 2 may not, under settled principle, be referred to in order to determine the precise boundaries of the authority granted by the certificate. See *Refrigerated Transport Co. v. United States*, N.D.Ga. 1963, 214 F.Supp. 536, 540. The generality of expression in the Monsey certificate thus suffers the intended service,

the specialized need, to go without assurance of service.[2] The defect in the certificate is sufficient to require setting the order aside, even if the occasion were one authorizing a special or charter operations motor common carrier certificate. *Hudson Transit Lines, Inc. v. United States*, D.N.J. 1970, 314 F.Supp. 197, 203–204.

But the critical defect in the determination under review is that it does not reflect—as did the Administrative Law Judge's decision—an application of administrative expertise to the resolution of a problem presented by complex facts, but rather, represents a manifest failure to apply the Commission's own rule of decision in evaluating a familiar and well recognized type of contract carrier application. It is not enough to assert that the Commission acted within its discretionary authority; the record must demonstrate the appropriate application of administrative judgment in response to facts which evoke such an exercise in making choice of decision and not the imposition of an arbitrary numerical cutoff in disregard of an applicable rule of decision governing the decisional choice. *Cf. The Arrow Line, Inc. v. United States*, D.Conn. 1966, 256 F.Supp. 608, 612. It seems clear that, if Division 1 had adverted to the controlling principle applied in the specialized class-need cases, it would have adopted the initial decision and given effect to the recommended order of the Administrative Law Judge.

The order of December 13, 1976, is reversed and the matter remanded to the Commission for further proceedings consistent with this decision.

---

**2.** Division 1 has said, *Latin Express Service, Inc., Common Carrier Application*, 1977, 126 M.C.C. 580, 590–591, in refusing the common carrier authority recommended by the Administrative Law Judge where the application was put forward as one for authority to serve a particular, allegedly unserved class-need:

"It is also significant to note that, should applicant be granted the authority it seeks,

there would be nothing to preclude applicant's seeking of ridership from *all* segments of the population. Indeed, our view of the record leads us to believe that applicant might well find itself compelled to seek out passengers from a broad base in order to remain viable."